## JANIK v. FORD MOTOR CO.

1. AUTOMOBILES—LICENSE TAG AS EVIDENCE.

Evidence, not in dispute, that the defendant, an automobile manufacturer, sold a car to a purchaser in the regular conduct of its sales business, and, following a custom, permitted the buyer to use its license number in driving through the city, and that defendant furnished for him, at his request, a chauffeur, who was one of the regular employees of the defendant, to drive the car in the city, *held*, not to charge the defendant with liability to a pedestrian injured by the negligent act of the driver of the automobile which had been paid for in cash and had become the property of the buyer, who was also an experienced driver.[1]

2. SAME—MASTER AND SERVANT.

An employee of one person may become the special servant

[1] On the question of the liability of an automobile owner for negligence of chauffeur furnished by third person, see note in 39 L. R. A. (N. S.) 933.

of another with all the mutual rights and obligations of master and servant for the time of, and with respect to, the special service in which he is temporarily engaged. The test is whether the servant becomes subject to the direction of the person to whom he is lent or hired, or remains under the control of his original employer.

Error to Wayne; Murphy, J. Submitted April 7, 1914. (Docket No. 2.) Decided June 1, 1914.

Case by Jan Janik against the Ford Motor Company for personal injuries. Judgment for defendant upon a verdict directed by the court. Plaintiff brings error. Affirmed.

*Clarence P. Milligan,* for appellant.

*Thomas M. Cotter (Edward Donnelly,* of counsel), for appellee.

STEERE, J. This action was brought to recover damages for personal injuries alleged to have been sustained by plaintiff, on July 29, 1910, from a passing automobile driven by an employee of defendant, while alighting from a Michigan avenue street railway car in the city of Detroit. From a judgment on a directed verdict for defendant plaintiff brings this case here for review on a writ of error. The controlling question involved is whether the relation of master and servant existed between defendant and the driver of the automobile at the time of the collision.

The uncontroverted facts essential to this inquiry are substantially as follows: On the day in question John I. Werner of Bronson, Branch county, Mich., went to the city of Detroit, purchased and paid for an automobile at the salesrooms of the Ford Motor Company on Jefferson avenue. He was in the hardware business at Bronson, and handled automobiles under what is called a limited dealer's license contract with

defendant, by the terms of which he could purchase its cars at a discount for resale. He was accompanied to Detroit by a prospective purchaser named Kline, to whom he expected to sell the car. He proposed to drive the car to Bronson and deliver it to Kline, whose home was near by. He had owned and driven automobiles, was an experienced driver, and had driven several kinds, including a Ford, making long trips with them. He had owned and driven a Ford at least two years before the time in question. After purchasing the automobile and paying for the same in full, he also purchased and paid for gasoline, oil, and carbide for the drive to Bronson. Upon the car was a card marked with the license number registered for the Ford Motor Company for the year 1910, under the Michigan motor vehicle law. Having fully completed his purchases and preparations for the journey, and when about to leave, accompanied by Mr. Kline, he asked the salesman from whom he had purchased the automobile if they would let him have a driver to take them to the city limits; and the salesman replied that he would see. Werner testified that though he was a competent driver himself, he was not familiar with city driving in the congested streets, and for that reason asked for a driver to go with and pilot him to the city limits; that he had made this request before when he drove cars through to Bronson, and as a matter of accommodation they had sent a driver with him, and on reaching the city limits he would himself take the car and go on. A man by the name of Groholski was furnished, and they started on the journey with him as driver.

Groholski was a regular employee of defendant, having been in its service for some time as a repair man, tester, and demonstrator. His instructions from Walker, the foreman at the salesrooms, were to put on his coat, get into the car, drive it for the two

gentlemen out to the city limits, turn the car over to them, and then come back on the street car. The three men got into the car about the same time, Werner sitting upon the back seat and Kline by the side of Groholski, to whom Werner said that they wanted to go over Michigan avenue. They proceeded westerly along Michigan avenue, and when near its intersection with Thirty-fourth street a street car overtook and passed their automobile, which was running along the avenue on its proper side of the track at a speed of from 10 to 15 miles an hour. As the street car neared Thirty-fourth street it commenced to slow down, to make a stop at the corner, and the automobile began to gain upon it. Plaintiff was a passenger upon the street car, and in alighting at Thirty-fourth street was struck by the automobile and injured, to what extent is a matter in dispute, as are also the circumstances surrounding the accident. He was thrown down, but not run over, by the automobile, which made a sudden stop. He was then assisted to his feet by the driver, taken into the automobile and driven to his home, where he walked without assistance from the car to the house. The questions of negligence, contributory negligence, and the extent of his injuries, which were closely contested, are but indirectly involved, and need not be further considered, as a verdict was directed on the ground that the driver was not defendant's servant, at the time of and in connection with this transaction. The limited dealer's license under which Werner bought this car provided for the delivery by defendant of cars f. o. b. at Detroit. Werner was required to pay cash for the same. He could then have the cars shipped by rail, he paying the freight, or could get them at defendant's salesrooms and drive them to Bronson, thus saving the freight. In this case he adopted the latter course. The records of the defendant show that the

car was sold, paid for, and delivered to Werner at the salesrooms.

It was shown to be the custom of defendant to mark its license number on pasteboard tags and put them on cars, having as a manufacturer but one regular license number on a metal plate issued by the State. These tags were sometimes left upon the cars when sold and driven away, if the purchaser wished, until he could secure a license for himself from the secretary of state, which sometimes took two or three days. Under this undisputed evidence the fact that defendant's number was on a tag attached to the car when Werner took it away raises no inference against his ownership and control. *Burns* v. *Paint Co.*, 152 Mich. 613 (116 N. W. 182, 16 L. R. A. [N. S.] 816).

It is contended by plaintiff that Groholski was not the servant of the purchaser of the car when the accident occurred; but of defendant, his regular employer; that he was acting under orders of his employer within the scope of the customary duties for which he was hired and paid; that in carrying out the orders of defendant he had charge and control of the car, did not know Werner, and took no orders from him, was solely engaged in the work of his general employer, and not that of another; that though Werner may have had the benefit of his work, the servant was in no sense transferred to him or put under his control.

It is the claim of defendant that under the undisputed facts Groholski, though a general servant of and regularly in defendant's employ, was temporarily loaned to Werner, to do work for him and not for defendant, and for the time being was working for and as the servant of Werner, who became the special master and responsible for Groholski's acts in relation to the particular service he was then rendering. The rule is long settled that a servant in the general

employment of one person may also become the special servant of another, with all the mutual rights and obligations of master and servant between them for the time of, and in relation to, the special service in which the servant is temporarily engaged. If an employer loans a servant to another for some special service, the latter with respect to that service may become liable as a master for the acts of the servant without any actual contract of employment between them or payment for service. Text-book authority, borne out by abundance of cited decisions, shows this is old doctrine. 1 Labatt on Master and Servant, § 52; 1 Bailey on Personal Injuries (2d Ed.), § 25; 26 Cyc. p. 1519; Shearman & Redfield on Negligence (6th Ed.), §§ 160, 160a, 161.

Counsel for the respective parties seem practically in harmony upon the rule by which the question involved should be tested, but widely at variance in applying the test. The essence of the best considered cases upon the temporary loan, or hire, of a servant for a special purpose is thus well stated in 26 Cyc. p. 1522:

"A person who avails himself of the use, temporarily, of the services of a servant regularly employed by another person may be liable as master for the acts of such servant during the temporary service. The test is whether in the particular service which he is engaged or requested to perform he continues liable to the direction and control of his original master or becomes subject to that of the person to whom he is lent or hired, or who requests his services. It is not so much the actual exercise of control which is regarded, as the right to exercise such control. To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under control of a third person. Subject to these rules the original master is not liable for injuries resulting from acts of the servant while under the control of a third person."

One of the important considerations involved in this class of cases is the ownership of the equipment, appliance, or instrumentality with or in relation to which the temporary service, out of which the alleged injury arose, is performed. If it be the property of the general master who has loaned or hired the servant, there is a stronger reason, followed by a greater presumption, that he should and would retain in whole or in part the control and right to dictate and direct its use in carrying out the work. While not always controlling, this has often been recognized as sufficient to turn the scale in otherwise doubtful cases, particularly in that line of special service relating to transportation, or carrying of persons and property.

In the case of *Joslin* v. *Ice Co.*, 50 Mich. 516 (15 N. W. 887, 45 Am. Rep. 54), strongly urged by plaintiff as controlling here, the general employer owned the team and wagon which inflicted the injury complained of, and had hired the same, with a driver, for the day to an independent contractor. The court held, citing the English case of *Quarman* v. *Burnett*, 6 M. & W. 499, that the owner of the team and general employer was the responsible master of the wrongdoer, being the "owner of the horses, and not any one at whose service the horses and driver were temporarily placed." Of the *Quarman Case* the court said that, whether correctly decided or not, it had been too generally recognized and followed to be questioned now, citing numerous English cases regarded as quite analogous to the case then under consideration. It is well pointed out by the trial court that these English cases, upon which the *Joslin Case* is based, have been later so interpreted as to distinguish them and the cases based upon them from the instant case. In *Jones* v. *Scullard*, 2 Q. B. Div. (1898) p. 574, in analyzing the previous English cases mentioned, Chief Justice Russell said:

"The principle, then, to be extracted from the cases is that, if the hirer simply applies to the livery-stable keeper to drive him between certain points or for a certain period of time, and the latter supplies all necessary for that purpose, the hirer is in no sense responsible for any negligence on the part of the driver. But it seems to me to be an altogether different case where the brougham, the horse, the harness, and the livery are the property of the person hiring the services of the driver."

Counsel for plaintiff refers to these English cases as being "musty with forgotten lore," and certain of the conclusions in them reached, as pointed out by Labatt, through resort to what an eminent English judge described as "desperate refinements." Be that as it may, the *Joslin Case* from this court, upon which counsel relies, was committed to and based upon one of the earliest English, so-called, "carriage cases," which the English courts interpreted, as above stated, in 1898. In the case of *Perkins* v. *Stead*, 23 Times L. R. 433, following the reasoning of *Jones* v. *Scullard*, *supra*, it was held that the servant of the vendor lent to the purchaser of an auto car, to drive it to a certain point was in that service the servant of purchaser. Stead purchased and paid for a motor car in London from a dealer who agreed in that connection to provide a driver to take the car to a certain place outside the city. Stead, when making the purchase, was accompanied by his son and his own driver, who was not experienced in driving the class of car purchased, nor familiar with the locality. While the car was being driven through the streets of London by the driver the dealer had furnished, defendant, his son and driver being in the car, a collision occurred with a bicycle, as a result of which the party injured brought an action against Stead for damages. It was held that, though the driver was the general servant of the vendor, yet at the time of the accident

he was under the control of defendant in the service which he was rendering in relation to property which defendant owned and was in possession of, and therefore defendant was liable for the driver's negligence. That case presents an element of uncertainty not found in the instant case in the particular that there the record indicates the vendor's agreement to furnish the driver to take the car through London was an element in the negotiations of purchase and sale, while here the subject was not mentioned until after the purchase was consummated.

Plaintiff's counsel cites and urges as controlling *Dalrymple* v. *Motor Car Co.*, 66 Or. 533 (135 Pac. 91), another automobile case, also similar in many of the circumstances and relations of the parties to the one under consideration. In that case a customer named Dunham purchased an automobile from the defendant, a dealer in the city of Portland, and was furnished a driver named Harrington to take it from defendant's garage to the suburbs of the city. Dunham accompanied the driver, and while they were on the way, the car being driven by Harrington collided with a boy and injured him. In an action against the motor car company for the driver's negligence it was held that the question of whose servant he was became, under the testimony, an issue of fact for the jury, chiefly on the question of delivery and assumed obligation of defendant to instruct Dunham in the use of the car. It was shown that when Dunham negotiated the purchase he was inexperienced in driving, and it was therefore arranged that the car purchased by him should remain in possession of the dealer until Harrington, a demonstrator in its employ, instructed him in its use. Harrington had given him some instructions in running the automobile two days prior to the accident. On the day of the accident he called for it, having decided to take it away. The head sales-

man instructed Harrington to take the car through the populous part of the city to an outskirt called East Portland, as Dunham was yet inexperienced as a driver, and there let him take charge of it himself. Harrington testified that Dunham was not a competent or experienced driver, and that his object in going with Dunham that morning was—

"Simply to take the car through the city and to get him over on the east side, out of town, where he could go from there by himself, because I refused to let him drive through town alone."

The court, in a somewhat exhaustive opinion, considers and reviews many of the leading authorities upon the questions involved, apparently with approval, recognizing the rule that the test is not so much the exercise of the power of control as the right to exercise such power; states that under the circumstances of this case it can well be contended that Dunham did not have a right to control Harrington in the operation of the car and says:

"Whether the owner, who is conceded to have known little or nothing about running the car, was with the driver while passing through that part of the city, or was to meet him at the place where it was intended that the owner should take charge of the car, would make but little difference. * * * Were it necessary for the act of the chauffeur Harrington to be defined, we would say that the service performed by him for the company on the morning of the accident was of much the same nature as the operation of the car for the purpose of demonstration or instruction. * * * The evidence tended to show * * * that the company undertook to perform the service as a part of the transaction, in connection with the sale of the automobile, as a part of its general business and in furtherance of the same; that Harrington, the servant, was doing the work for his master, the company, and not for himself, nor on his own account, nor as a mere favor to the purchaser; that it was as much a part of the general business of

the company as though it had been performed prior to the time of the purchase of the car."

In the instant case there was no agreement or suggestion, as a part of the negotiations and purchase, that the motor company should assume, or undertake, any instructions to the purchaser relative to operating the car, or to see that when it left the salesrooms it was properly run for any length of time, or to any place. He was a dealer in cars himself, experienced in their use, and knew what was necessary. The deal was closed, he had his receipt, and the car had been delivered to him at the time he asked for the accommodation. Groholski was sent along to drive as a "mere favor to the purchaser." At the time of the accident Werner, an experienced driver, not only owned the car but was in actual occupation and possession of it, riding with a prospective purchaser out from the city towards their homes. He was in no sense helpless, looking to, and dependent upon, the driver, as would be the case of an inexperienced purchaser. Like many other experienced drivers from the country or small towns he felt less confidence in driving through the congested thoroughfares of a large city, and for that reason asked the loan of a driver to the suburbs. The fact that he found no occasion to give instructions to the driver, except to tell him along what street to drive, and relied upon his skill and experience, in no way affected Werner's absolute right to control him in everything he did in connection with the car. *Samuelian* v. *Machine Co.,* 168 Mass. 12 (46 N. E. 98). Under the undisputed testimony, the motor company had no control over nor interest in the car after it left its salesrooms, nor in the manner in which it was run, nor in where it went. It could not dictate how the car should be run; the most it could do would be to recall from this special employment the servant it had loaned. Dur-

ing Groholski's absence from the salesrooms in this service he was doing the work of Werner, to whom he was gratuitously loaned, on the initiative and request of Werner, who had full right to dictate as to his own property and direct in what manner the car should be operated. He unquestionably could have taken charge and driven it himself, if he saw fit at any time, and, if so disposed, could have discharged the driver and proceeded without him; he was therefore for the time being the special master.

The conclusion of law deduced by the trial court from the undisputed fact that Groholski was, at the time of the accident, the servant of Werner, whose automobile he was driving, and not of defendant, whose interest in and control over that instrumentality had ended, is sustained.

The judgment is affirmed.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.