SIKORA *v.* FELLOWCRAFT CLUB.

1. NEGLIGENCE—ELEVATORS—LICENSEES—LANDLORD AND TENANT.
Where the proprietor of a building leased to defendant club the upper stories, together with a power freight elevator, for ten years, and the defendant club undertook the expense of operating and repairing the elevator, the proprietor reserving the privilege of using the elevator, to himself and other tenants, in so far as their use did not interfere or conflict with the requirements of the club, and agreed to pay a just proportion of the expenses thereof, where, also, the landlord granted to the club the use of part of the basement, at a subsequent time, to pay his part of the expenses of maintaining the elevator, the landlord was not responsible for the negligent killing of plaintiff's intestate, who was delivering beer for defendant club, whose servant operated the elevator at the time of the ac-

cident; and upon proofs showing that the elevator was delivered to the defendant club in good condition.[1]

2. SAME—MASTER AND SERVANT—PERSONAL INJURIES.

But the servant in control of the elevator, being employed by the club, which maintained the apparatus, was chargeable with neglect for starting it just as decedent attempted to enter, and for his negligence the club was responsible, under the rule of *respondeat superior*.

3. SAME—EVIDENCE—RES GESTÆ—HEARSAY RULE—EXCEPTION — ELEVATOR.

Testimony to the effect that decedent's superior, having charge of the delivery of beer, told deceased to remain with the horse and directed the operator to start the elevator, was admissible as part of the *res gestæ*, and it was error to exclude it.

4. SAME—REPAIRS—DEGREE OF CARE—DEFECTIVE APPLIANCES— CHARGE.

*Held*, that it was erroneous to instruct the jury that the defendants were under obligation to maintain the elevator gate in repair, when the issue should have been limited to the simple question whether the person directing decedent had notified him to remain with the horse and whether the elevator started as decedent entered or was already in motion.

5. SAME—CONTRIBUTORY NEGLIGENCE.

And it was improper to charge the jury that defendants owed towards the intestate a high degree of care, or to inform them that the latter was not required to stop, listen, or specially examine the elevator before entering.

Error to Wayne; Barton, J., presiding. Submitted October 13, 1915. (Docket No. 78.) Decided December 21, 1915.

Case by Frances Sikora, as administratrix of the estate of Adam Sikora, against the Fellowcraft Club and others for the unlawful killing of plaintiff's decedent. Judgment for plaintiff. Defendants bring error. Reversed.

[1]On liability of landlord to third person for condition of premises in possession of tenant, see notes in 26 L. R. A. 197, 50 L. R. A. (N. S) 286.

*Chamberlain, Denby, Webster & Kennedy,* for appellants executors of Palmer Estate.

*Clark, Lockwood, Bryant & Klein,* for appellant Fellowcraft Club.

*Samuel G. Thompson, Harry W. Cullen,* and *Cullen, Casgrain & Wurzer,* for appellee.

MOORE, J. This case is brought to recover damages for injuries resulting in the death of Adam Sikora because of the alleged negligence of the defendants.

Thomas W. Palmer was the owner of a large building on Washington boulevard in Detroit. The building had a basement, and was six stories high above the basement. The first story has five stores; the second and third floors are used as offices. The building was completed the latter part of 1910. The lease from Mr. Palmer to the Fellowcraft Club is dated October 1, 1910, and it leases the three upper floors of the building—

"together with a first class electric passenger elevator and a proper power freight elevator, with access to said elevators and the stairways leading to said upper three floors through the main halls in said building for the term of ten years.

In this case it is provided that:

"it [the Fellowcraft Club] will also pay the expense of operating and keeping in repair the said passenger elevator and said power freight elevator installed in said building by the party of the first part for the use of said party of the second part, and demised hereby.
\* \* \*

"It is further mutually understood and agreed by and between the parties hereto that the said party of the first part shall have the right and privilege, for himself and his tenants in said building of which the premises hereby demised form a part, to use the said power freight elevator furnished for the use of said party of the second part and hereby demised, provided always that such use shall not conflict or interfere with

the enjoyment of the same by the said party of the
second part for its uses and purposes, and provided
also that said party of the first part shall pay to said
party of the second part for such use of said elevator
had by himself and tenants such proportion of the
monthly expense of the operation and repair of the
same and of insurance against accidents in operation
thereof, as shall hereafter be found equitable upon the
basis of the relative use of the same made by the said
party of the first part and his tenants."

In January, 1911, an agreement was made, whereby
Mr. Palmer gave the club the use of a certain portion
of the basement as payment of his proportion of the ex-
pense of operating the freight elevator, keeping it in
repair and insuring it against accident. When the Fel-
lowcraft Club took possession the freight elevator and
its appliances were inspected. They were of approved
type and in common use and were in good working
order.

The Fellowcraft Club is a social club. The freight
elevator has been operated exclusively by the em-
ployees of the Fellowcraft Club. At times freight was
carried on this elevator to the second and third floors
of the building for the tenants occupying those floors.
On July 29, 1913, this elevator was operated by Ernest
Law, an employee of the Fellowcraft Club. At the
time of the accident the elevator was being used to take
two half kegs of beer from the alley entrance to the
Fellowcraft Club. The opening in the east wall of the
elevator shaft at the alley level was five feet wide and
seven feet high. There was a metallic fire door on the
outside of this opening which rolled up like a curtain.
In this opening there was a semi-automatic gate.
When the elevator is brought to the level of the open-
ing on the alley the operator lifts the gate and a dog
holds it from falling. If the elevator is raised or low-
ered six to twelve inches this dog is released and the
gate falls, closing the opening.

On July 29, 1913, the plaintiff's intestate was employed by the Stroh Brewing Company. He was sent out as a helper with Frank Kottlefski, a driver of a one-horse truck used for delivering beer, the vehicle, horse, and beer belonging to the Stroh Brewing Company. The plaintiff produced two men who claimed to have seen the accident. One of them testified:

"When I came out into the alley I saw a beer wagon and a man in the alley. I saw a man directly in front of him, and a man up by the beer wagon. * * * There was a man directly in front of me, about eight to ten feet. Then I noticed another man up by the brewery wagon, who seemed to be covering up the wagon. He finished that, and then went towards the elevator entrance in the Palmer Building. I saw him step his right foot upon the elevator. The elevator started up immediately, and I stopped to see what happened. He slipped—it caused me to stop, and he fell face forward with his hands out on the elevator platform. His legs were hanging over the edge of the elevator. The elevator was standing still when I first saw him step on the elevator platform. I didn't then see any gate. I saw the man go up on the elevator in that position. When the elevator started up, and I saw the man in that position, I hesitated to see if he would recover himself, or get up, or get any assistance; but that did not happen, so I saw him going on past the upper opening. I stepped over to the elevator to see what became of him, and I looked up the shaft, and the elevator stopped after it had got above that opening a few inches, and * * * I heard one voice say, 'Let me down! let me down!' that way. They all seemed to be excited, and then I heard another voice, 'Let him down! let him down!' and some one said, 'All right! all right!' Instead of the elevator coming down, it started up again. I heard a crackling sound, as if timber or wood were breaking, then I realized what had happened, and I was heartsick. I stepped back across the alley from the place just on a diagonal across the alley out of the way. When I first noticed the man step on the elevator, I could see just the back of a man and the edge of a beer keg. My range of vision was

not so it would permit me to see on the inside of the elevator, but I could see the outer edge of the elevator and the entrance to it."

The second witness for the plaintiff testified:

"As I came up near the Palmer Building the first thing that caught my sight was a wagon, and I saw a man there at an elevator. I stopped and lit my cigar, and naturally coming on down more, as I lit my cigar, it went out and I stopped again to light it, then started on down. By that time I was within at least ten feet of the elevator entrance. Then I saw a man leave from the elevator and go towards the wagon. The wagon seemed to have beer or something in it, and had a cover. Then I heard a man say, 'Go and cover the wagon John, and come back.' I understood him to say 'John.' That is what I heard him say. By that time I walked on down. I had nothing in particular to do, and I used to walk to work at the Fellowcraft Club, and I stopped to watch them taking it up, and I walks back, and I stopped in front of it just like I am here (indicating) and I saw this man step on the elevator. When he stepped the elevator started up; it was absolutely still until he stepped on it and it started up and caught the man midway of the back. Well, from the position that I was looking at and where I was at, he had one leg doubled up; it seemed that he tried to make it upon there, and then the first stop was it caught him; it seemed to be the middle through the back and stomach, and then I ran up, of course; I was excited to see, so I ran up and I says to this—I run up there, looked at the outfit, and it suspended about a minute, and then the man says, 'Lower me down! lower me down!' He says, 'I am all right now.' Well, then it was there for just about, I reckon, about 30 seconds, or a minute, possibly, before the elevator took another start; then the shriek and the breaking, and then I looked up, thought possibly something had happened; then I heard excited voices talking; then the elevator started down. I heard the timber breaking, and I heard the man shriek. The elevator shot down to the basement. * * * When I first saw Adam Sikora enter this elevator, there was a white man sitting on the

right-hand side and a colored fellow was standing over on the left, on the side fronting towards Washington boulevard. I have ridden on this elevator many times. The cable that operates the elevator is on the left-hand side and next to the inner portion of the building. Whatever the operative force is, it is on the left-hand side and towards the inner portion of the building. I saw Adam Sikora step on the elevator while it was standing still. The operator was standing with his face toward the boulevard and his back towards the alley. The other person on the elevator was sitting in the same position, facing in the opposite direction away from the alley."

At the time of the trial the operator of the elevator at the time of the accident was dead.

On the part of the defendant Frank Kottlefski testified in part:

"I am working for Stroh's Brewery. I have worked for them going on two years next June. I was working for them at the time of the accident to Mr. Sikora. * * * Mr. Sikora was employed by Stroh's Brewery. He was only extra man. * * *

"Q. Under whose supervision, whose charge, was Sikora?

"A. I was boss at that time.

"Q. When he was with you?

"A. Yes, sir. * * * I remember the day that Mr. Sikora was injured. * * * On the day in question we were to take some beer from the brewery to the Fellowcraft Club. * * * I was driving what they call a single truck. It was drawn by one horse. I came from Grand river into the alley and up through the alley going north, going toward Clifford street, so when I got up in front of the door I got off the wagon. So did my helper Mr. Sikora. I drove somewhere between two and three feet off from the building. The back end of my wagon came just about even to the door that went into the building. The horse was north of the door. I got off the truck and rang the bell for the elevator to come down. There was a bell right on the side there, just pressed the button in the wall of the building. There was a gate over this opening. It was down

189 Mich.—16.

from the hole. It was hanging down, so the elevator man came down with the elevator and stopped and shoved the gate up. After he shoved the gate up nobody had to hold it; it stays right up there. After that I took a half barrel of beer off to put it on the elevator, then I took another off and put it on the elevator. Two half barrels I put on. Sikora did not help to handle these half barrels. He was on the other side of the truck, on the east side of the truck. After I put the two half barrels on the elevator, I walked on the elevator, and I told Mr. Sikora— We always called him 'John,' and I says, 'Cover up the beer and watch the horse,' and he says, 'I do so.' And I says to Mr. Sikora, 'On the way coming back I will go right down to the basement, there is some empties and I will bring them up,' and I said, 'Be sure and don't go away from the horse.' He said, 'All right; I will do so.' So I turned around and sat down on the half barrel, and I said, 'Let it go.'

"*Mr. Wurzer:* Just a minute. I move to strike out that last.

"*The Court:* Yes; what he said to the elevator man hardly would be competent.

"*Judge Lockwood:* Here is a man who was looking and talking with the only other man there, and he says 'All right, go ahead!' and the man then starts it. I think that is competent to show that."

The court granted the motion to strike out any statement made by the witness as to what he said to the operator on the elevator. Witness (continuing) :

"I saw Mr. Sikora after the elevator started. As the elevator started, just as the elevator started, he was on the east side of the truck, right by the hind wheel covering the beer. After this elevator was started I sat down on a half barrel and turned my face toward the elevator man. The elevator was in motion when I sat down, and the elevator was in motion when I saw Sikora at the hind wheel of the wagon. The next thing I heard or saw, the elevator was going up and I was sitting down, and at once I heard a holler and he said, 'Oh, gee, stop! stop!' and I looked around, and I said, 'Good God, stop quick!' and just as I hollered the 2x4

or 4x4, that little gate is hung on—there is a little pulley there, and a rope goes there holds the gate up there —that came out, and at the same time the fellow on the elevator, he turned around and he stopped, but while he stopped he was up between the elevator and the beam already.

"*Q.* Now, will you show to the jury how Mr. Sikora was with reference to the elevator at that time? You can stand up and show, if you want to.

"*A.* He was this way (indicating) on the elevator, laying over like that (indicating). One leg he had down and the other one he had like this here (indicating), lying over like that (indicating).

(The indication made by the witness showed that Sikora was lying upon his face upon the floor of the elevator with the lower part of his body extending out easterly beyond the edge of the elevator.)

"*Q.* Did the colored man stop?

"*A.* Yes; he stopped right there. At the time the elevator stopped the man Sikora was a few inches from the bottom of the beam, between the elevator and the beam. He was pressed between the elevator and the top of the beam.

"*Q.* What happened to the gate as you heard him holler?

"*A.* Well, I just heard the gate crackling, and I know that 2x4—I call it a 2x4—that broke out of one end. That 2x4 was a piece to which the rope was attached that holds the gate up. The gate shoved up against it. The cross-piece where the gate hangs broke.

"*Q.* Now what was the next thing done after the elevator stopped?

"*A.* Well, I hollered to him to lower down.

"*Mr. Wurzer:* Just a minute; I make this same objection.

"*The Court:* Not what you said—what was done.

"*Witness* (continuing): Well, he lowered down the elevator. He lowered it somewhere around two feet, something like that. I got hold of him (Mr. Sikora) around his shoulders like, you know, and by the leg and I twisted him around and put on the elevator, straightened out on the elevator. From the time the elevator stopped it did not start up again. It did not go up any more after it stopped. After I had straight-

ened this man out on the floor of the elevator he was taken down in the basement."

There was a long cross-examination of these witnesses, but the testimony quoted is the substance of the testimony of all the witnesses who claim to have seen the accident. Each of the defendants asked for a directed verdict. The judge submitted the case to the jury in a long charge. From a verdict and judgment of $6,000 in favor of the plaintiff the case is brought here by writ of error.

The defendant the Palmer Estate claim a verdict should have been directed in its favor for several reasons, among them:

(a) The only negligence disclosed by the testimony, if there be any negligence, is that of the operator of the elevator who was hired by and was under the exclusive control of the defendant the Fellowcraft Club.

(b) Because the deceased came to the freight elevator upon the invitation of the defendant the Fellowcraft Club, and not on the invitation of the executors.

(c) Because at the time the accident happened the freight elevator was in the exclusive control of the defendant the Fellowcraft Club, and the executors or the tenants of the executors because of its use by the Fellowcraft Club would have no right to use it on their own account.

(d) That the executors are not responsible for negligence of a servant or servants of the Fellowcraft Club.

Counsel for the appellee contend that as the elevator might be used to carry freight for all the tenants in the building the landlord was bound to see not only that the elevator was in good repair, but was also obliged to have it operated without negligence, citing *Shoninger Co.* v. *Mann*, 219 Ill. 242 (76 N. E. 354, 3 L. R. A. [N. S.] 1097), and *Sciolaro* v. *Asch*, 198 N. Y. 77 (91 N. E. 263, 32 L. R. A. [N. S.] 945). A reference to these cases will show them distinguishable from the instant case. In the first of them "defend-

ant retained the control of the halls, entry, and elevator in the building for the common use of its several tenants." The elevator was in charge of a servant of the defendant. The plaintiff was in the employ of tenants who were entitled to the elevator service.

In the case of *Sciolaro* v. *Asch, supra,* the record shows that plaintiff was in the employ of a firm who occupied the ninth floor of a building under a lease given them by defendant which "with other privileges included steam heat and usage of passenger and freight elevators in common with other tenants in the building." In disposing of the case the court said in part:

"While the lease referred to may not measure or limit the rights of the plaintiff as an employee of the tenant, its covenants relating to the furnishing of elevator service by the appellant tended to establish the duty of the latter in respect of that service. The building was one occupied by a number of tenants, who were to have in common the use of the steam heat and the elevators. As to these things, which were to be furnished by the appellant, he had a general control and a corresponding duty. This control and duty were reciprocal and inseparable. The right to control and manage carried with it the obligation to do so with reasonable care and prudence."

So far as this case is applicable to the case we have before us it does not sustain the contention of the appellee.

In 9 R. C. L. p. 1250, it is said:

"Where the owner of a building leases different floors or rooms to different tenants, but retains the control and management of an elevator in the building, he is responsible for injuries to tenants, their employees and such other persons as may lawfully use the elevator. But if the tenant has the sole control and management of an elevator in a leased building, he, not the landlord, must give warning and look out for the safety of the persons whom he invites to use the elevator."

In *Peake* v. *Buell,* 90 Wis. 508 (63 N. W. 1053, 48 Am. St. Rep. 946), appears the following:

"The elevator was operated by the defendant's tenants, and not by him. The defendant owed the deceased no duty in respect to the operation of the elevator. To constitute actionable negligence, the defendant must be guilty of some wrongful act or breach of positive *duty to the plaintiff. Griswold* v. *C. & N. W. R. Co.,* 64 Wis. 652 [26 N. W. 101] ; *Cole* v. *McKey,* 66 Wis. 510 [29 N. W. 279, 57 Am. Rep. 293] ; *Dowd* v. *C., M. & St. P. R. Co.,* 84 Wis. 116 [54 N. W. 24, 20 L. R. A. 527, 36 Am. St. Rep. 917] ; *Goff* v. *C. R. & M. R. Co.,* 86 Wis. 245 [56 N. W. 465]."

There is a discussion of the doctrine of *respondeat superior* in *Hartley* v. *Miller,* 165 Mich. 115 (130 N. W. 336, 33 L. R. A. [N. S.] 81), that is helpful. See, also, *Riley* v. *Roach,* 168 Mich. 294 (134 N. W. 14, 37 L. R. A. [N. S.] 834) ; *Daugherty* v. *Thomas,* 174 Mich. 371 (140 N. W. 615, 45 L. R. A. [N. S.] 699, Am. & Eng. Ann. Cas. 1915A, 1163) ; and *Janik* v. *Motor Co.,* 180 Mich. 557 (147 N. W. 510, 52 L. R. A. [N. S.] 294).

In the instant case the condition of the elevator was good at the time it was delivered by the landlord to the Fellowcraft Club. From that time the obligation to keep in repair was upon the Fellowcraft Club. The elevator was in its charge. If the deceased had any right upon the elevator it was because he was helping to deliver the beer to the Fellowcraft Club by means of an elevator that was in its control and operated by its employee. Under these circumstances we think it should be said as a matter of law that the Palmer Estate is not liable, and that a verdict should have been directed in its favor.

The defendant the Fellowcraft Club urges many assignments of error, some relating to rulings upon the admission of testimony, some relating to the refusal to give requests, and some to the charge as given. We

think it was not error to refuse to charge there could be no recovery against the Fellowcraft Club. As we have seen, the testimony was in sharp contrast, and presented an issue of fact for the jury.

It is said the court erred in striking out the testimony of Mr. Kottlefski as to what he said to the elevator man just before he started the elevator. In this connection it should be recalled that the deceased was under the direction of this witness, and according to his testimony had nothing to do with placing the half kegs of beer upon the elevator, and was directed by the witness to remain with the horse. The testimony stricken out was not only part of the *res gestæ*, but it bore directly upon the question of whether the elevator man was negligent. He had been called to bring the elevator to the opening that the two kegs of beer might be delivered, presumably he knew Mr. Kottlefski was in charge of that delivery, and when the beer was upon the elevator he heard the direction given to the deceased to remain with the horse, and was then told by Mr. Kottlefski "to let her go." We think it was error to strike out this testimony.

The court was requested to charge there was no testimony that the injury to deceased was caused by a want of repair in the gate or elevator. The court declined to give these requests, and charged the jury at great length upon the duty of each of the defendants to keep the gate and the elevator in repair. We have already quoted the substance of the testimony given by those who claimed to have seen the accident. This testimony made the issue a very simple one. Was the elevator started when the deceased having the right was getting upon it as claimed by the witnesses for the plaintiff, or was he directed by one having the right to direct him to remain with the horse, as claimed on the part of the defense. We think the lengthy charge of the trial judge upon the duty of repair tended to con-

fuse the simple issue. See *Hall* v. *Murdock,* 114 Mich. 233 (72 N. W. 150).

The charge was a very long one. In it appeared the following:

"The persons having charge or control of the maintenance and operation of this elevator were bound to use and exercise that care and caution to prevent injury to passengers upon this elevator that an ordinarily prudent person under like circumstances would use, having in mind the nature, kind, character, and construction of the elevator, and the presence or absence of danger under all the surrounding facts and circumstances in this case. This may be said, under the circumstances in this case, to be a high degree of care. * * * The deceased was required to use and exercise such reasonable care as a person of ordinary prudence would exercise under like circumstances for his own safety. But, under ordinary circumstances, an open door at a stationary elevator constitutes an invitation to all persons desiring and entitled to do so, to enter or leave at will, and the plaintiff's intestate, Adam Sikora, had a right to assume if the door or entrance to the elevator was open and the elevator was at a standstill, that he might enter the elevator safely. And under such circumstances the plaintiff's intestate was not charged with the duty of stopping to look, to listen, or to make a special examination."

The use of the words, "This may be said under the circumstances in this case to be a high degree of care," "and under such circumstances the plaintiff's intestate was not charged with the duty of stopping to look, to listen, or to make a special examination," placed too high a duty upon the defendant the Fellowcraft Club, and too little responsibility upon the part of the deceased. The charge also ignored the testimony to the effect that deceased was told to remain with the horse. See *Henson* v. *Beckwith,* 20 R. I. 165 (37 Atl. 702, 38 L. R. A. 716, 78 Am. St. Rep. 847) ; *Bennett* v. *Butterfield,* 112 Mich. 96 (70 N. W. 410) ; *Hall* v. *Murdock,* 114 Mich. 233 (72 N. W. 150) ; *Patterson* v. *Hemen-*

*way,* 148 Mass. 94 (19 N. E. 15, 12 Am. St. Rep. 523).

We do not think it necessary to discuss the other assignments of error, as they are either not well taken, or will not occur again.

Judgment is reversed, and a new trial ordered.

BROOKE, C. J., and PERSON, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.