# STATE OF MICHIGAN

# COURT OF APPEALS

LESTER D. WOOD,

       Plaintiff-Appellant,

v

WILLIAMS & WILLIAMS II, LLC, WILLIAMS
& WILLIAMS TRUCKING, LLC,

       Defendants,

and

GIPSON BROTHERS TRUCKING, INC,

       Defendant-Appellee.

UNPUBLISHED
December 9, 2014

No. 317716
Wayne Circuit Court
LC No. 12-004911-NO

Before: BORRELLO, P.J., and WILDER and STEPHENS, JJ.

PER CURIAM.

Plaintiff appeals as of right an order of dismissal entered after the trial court granted summary disposition in favor of defendant Gipson Brothers Trucking, Inc, (Gipson Brothers) pursuant to MCR 2.116(C)(10). For the reasons set forth in this opinion, we reverse and remand for further proceedings.

## I. FACTS

This case involves an injury that occurred during demolition work that was being performed at an industrial site in Detroit formerly owned by the Chrysler Corporation. Specifically, following Chrysler's bankruptcy, through a series of transactions, Terry Williams obtained an ownership interest in Chrysler's Plymouth Road Office Complex ("PROC" or "the complex"). Williams operated several limited liability companies (LLCs) including defendants Williams & Williams II, and Williams & Williams Trucking (Williams defendants).[1] In 2012, Williams began demolishing parts of the complex, stripping it of scrap metals and other

---

[1] For ease of reference, we will refer to Terry Williams as "Williams."

-1-

valuables. Williams then sold the metals to scrap yards in Detroit. In addition, Williams retrofitted part of the complex presumably for his own use, installing hydraulic car lifts in an area of the complex.

Gipson Brothers leases industrial machinery including front-end loaders, bulldozers, shearers, fork-lifts, and tractor-trailers. Herman Gipson, Sr., Sherman Gipson and Harvey Gipson were the principals of the corporation. Gipson Brothers had about 10 employees, including Kevin Gipson, Herman Gipson Jr., Martez Gipson, and Dwayne Gipson. Among other things, these employees operated the equipment that Gipson Brothers leased to its customers.

In January 2012, Gipson Brothers agreed to lease heavy equipment to Williams for the demolition project. Gipson Brothers and Williams did not enter into a formal contract, but the parties understood that their agreement would involve Gipson Brothers leasing equipment to Williams and that Gipson Brothers' employees would operate the equipment at the PROC. Gipson Brothers charged a flat $150-per-hour rate for each piece of equipment with an operator. About four Gipson Brothers employees (the operators) would appear at the PROC on a daily basis to operate the machinery. The operators performed tasks dictated by Williams. At the end of the day, the operators had Williams sign daily work tickets and then submitted the tickets to Gipson Brothers. Gipson Brothers, in turn, compiled weekly invoices and billed Williams for the work. In return, Williams was required to submit payment to Gipson Brothers in cash on a weekly basis because "he was not trustworthy." Gipson Brothers paid the operators and continued to provide workers compensation insurance for the operators while they worked at the PROC.

Plaintiff, a journeyman electrician, welder, and all-around handy-man worked as a sole proprietor. Plaintiff testified that Williams hired him in early 2012 to perform multiple tasks at either the PROC or buildings in and around the PROC. Among other things, plaintiff salvaged materials, ran electrical wiring, installed conduit, and worked on plumbing. Plaintiff earned $20-per-hour and was paid in cash.

At times, plaintiff's work necessitated that he be lifted 10 to 15 feet to the ceiling. Per Williams' instruction, plaintiff would ask Kevin Gipson to use a "SkyTrak" industrial forklift and a metal parts basket to lift him to the ceiling so he could perform work. Kevin testified at a deposition that he was the only Gipson Brothers employee that operated the SkyTrak at the PROC. According to Kevin, the SkyTrak was a diesel machine that had an operator's cab to the left of the boom. The boom extended out in front of the forklift and could reach 15-20 feet in front of the driver's seat. Kevin had a Commercial Driver's License (CDL), but, according to him, there was no special permit required to operate the SkyTrak. Instead, Kevin testified that it was easy to learn how to operate the machine and his father and brother showed him how. He had some previous experience using the SkyTrak, but he was not familiar with all of the "sightlines."

Initially, per Williams' instruction, Kevin hoisted people up into the air using a table with two rails at either end or a skid. Plaintiff apparently objected to work platforms that did not "capture the forks" of the SkyTrak—i.e. the platform protruded over the ends of the forks. Plaintiff and Kevin eventually chained a metal parts basket to the forks of the SkyTrak so that plaintiff could stand inside the metal basket while he was lifted up to 15-feet in the air to work

-2-

near the ceiling. Kevin would move plaintiff around according to where plaintiff needed to be positioned. Although it was difficult to hear over the sound of the diesel engine, Kevin adjusted the boom according to plaintiff's verbal instructions. Plaintiff was about 5'-7" and the basket was approximately three-feet high. Plaintiff put his tools inside the basket when he was lifted in the air and there was not enough room to sit in the basket. Plaintiff was not restrained when he stood inside the basket, but Kevin testified that he ensured the basket was chained to the SkyTrak so it would not slide off during operation.

On March 24, 2012, plaintiff was running electrical wiring through conduit on the ceiling at the complex to provide electricity to two hydraulic car lifts that Williams installed. Plaintiff completed work on one area and then asked Kevin to move him to another area. Kevin complied, lowered plaintiff to the ground, and then moved the SkyTrak to the second area where plaintiff had to work. Kevin testified that the area was crowded with obstacles and that there were steel trusses that ran parallel in the ceiling near where plaintiff was working. Kevin lifted plaintiff up into the air. Plaintiff explained that the basket on the boom was extended about 15 to 20 feet away from Kevin. Plaintiff began to work on the wiring, but he needed to be repositioned, so he asked Kevin to go up "two inches." Kevin agreed, and started the SkyTrak's diesel engine. Plaintiff testified that the machine then "lurched" upwards about four or five feet instead of two inches. He explained that Kevin "took me up so far" that part of the boom "grabbed a hold of" a steel truss. Plaintiff explained that when the boom, or "backstop" on the forklift, came off the truss, the basket "bounced" and "it's getting real rough riding" and "I'm yelling to tell him to stop." Plaintiff testified about what happened next as follows:

> After it left - - this backstop left the bottom of the beam - - it was going so far that it caught on it, and then it was riding and pushing it over, and it slipped off there and came down between the basket from here- - the basket where I was holding onto it. And I don't know if it was from jumping around that I put my hand down to hold on so I didn't get flung out, and the bottom of the beam came down on my hand. Now it's stuck in there, and I'm panicking, man, I know that it's bad, I can see it you know. I can see Kevin in the thing, and I could see my hand, and I'm trying to get it out, and it's not going to come out. But he had stopped so far beyond that two inches it was unreal. I panicked, I grabbed a hold of that beam, and I'm . . . trying to get it off . . . because I didn't want to use his hi-lo you know, figuring it's going to rub my hand off, you know.

Kevin testified that after he initially positioned plaintiff near the ceiling, his view of the steel trusses was obscured. When he went to reposition plaintiff, Kevin stated that the SkyTrak was "boomed out so far" that he could not see if the "tip" was touching anything and he could not see that any part of the boom came in contact with the steel truss. He explained, "I just continued going up, because I thought everything was fine;" however, he started "thinking something could be going on" when the machine "didn't feel to be acting correctly." Kevin testified that, unknown to him at the time, the boom pressed against the steel truss with sufficient force to lift the back tires of the SkyTrak up off the ground. Kevin testified that plaintiff had no time to warn him that something was wrong and 10-15 seconds after he started the lift, the boom slipped off the truss and "shot" plaintiff "in the back - - it shot the whole front of the forks up into the air. It shot the whole - - it lifted the front wheels off and then came back down, and then it was a pretty big shake, even for me in the machine." Kevin testified that the parts basket was

-3-

propelled into a light fixture on the ceiling and he stated that he thought, during the violent shake, plaintiff grabbed onto the backstop of the forklift and then his hand was crushed.

Plaintiff yelled to Kevin to bring him down and Kevin lowered the boom vertically. Plaintiff's right hand was seriously injured and Williams brought him to the emergency room where he underwent surgery. Plaintiff testified that the following six to eight weeks was "pure hell," and he had severe pain in his hand nine months later at his deposition. Plaintiff, who is right-handed, testified that he had constant burning pain in his entire right hand all of the time; his right hand was permanently "cupped" or "bent" such that he could not button his shirt, turn a doorknob, turn a key, tie a tie, or perform other basic everyday tasks such as personal hygiene with his right hand. In addition, plaintiff could not do his former job, and he lost most of his former clients; he attempted to do some work but was unable to complete the tasks as he could not grip a hammer or climb up a ladder. Plaintiff testified that his surgeon recommended that he have another surgery on the hand, but plaintiff stated that he did not have health insurance and he could not pay for the surgery or repay the hospital for the emergency surgery. Plaintiff attended physical therapy sessions and paid for those out-of-pocket in addition to paying for prescription medications.

On April 11, 2012, plaintiff commenced this suit against defendants. In addition to his claims against the Williams defendants, in his second amended complaint plaintiff alleged that Gipson Brothers was directly liable for his injuries because the company negligently failed to "train, certify and supervise" its lift-truck operator, Kevin, in accordance with MIOSHA standards and allowed Kevin to operate the lift-truck in a negligent manner that caused his injury. Plaintiff also alleged that Gipson Brothers was vicariously liable for the negligent acts of Kevin. Specifically, plaintiff claimed that Kevin worked for Gipson Brothers at the PROC, and during the course of his employment with Gipson Brothers, he operated the lift-truck in a negligent manner. Plaintiff claimed that Gipson Brothers was liable under the doctrine of *respondeat superior*.

Gipson Brothers moved for summary disposition pursuant to MCR 2.116(C)(8) and MCR 2.116(C)(10), arguing that it was not liable for the acts of its employees under the "borrowed" or "loaned servant" doctrine first set forth in *Janik v Ford Motor Co*, 180 Mich 557; 147 NW 510 (1914). Specifically, Gipson Brothers argued that it leased equipment and its employees to Williams, claiming that it did not retain any control over the employees when they worked at the PROC for Williams. Gipson Brothers argued that Williams supervised Kevin at the work site, and it "resigned full control" of Kevin to Williams such that it could not be held responsible for Kevin's negligence. Gipson Brothers cited deposition testimony of its employees wherein the employees testified that Williams instructed them on their daily work assignments and was in control of the operations at the work site.

Plaintiff responded, arguing that summary disposition was not warranted. Plaintiff argued that there were questions of fact to support that Gipson Brothers was both directly and vicariously liable. Plaintiff argued that evidence supported that Gipson Brothers failed to adequately train, equip and monitor Kevin and that Kevin was negligent in his operation of the SkyTrak. Plaintiff attached a deposition of, A. David Brayton, CSP, CPC, a safety expert who reviewed the depositions of the individuals at the work site and opined that there were "innumerable" MIOSHA violations. Brayton testified that the metal basket did not meet

-4-

MIOSHA standards for a work platform and that Kevin violated MIOSHA standards when he performed a lift without being able to see the platform at all times. Plaintiff argued that this testimony showed that Kevin was negligent, and it argued that Gipson Brothers was vicariously liable in that it maintained control over Kevin. Plaintiff noted that Gipson Brothers paid its employees for the work at the PROC, maintained workers compensation insurance for the employees and the employees used Gipson Brothers equipment at the worksite. Plaintiff also noted that Herman Jr. sometimes directed other Gipson Brothers operators and the operators called Gipson Brothers when they needed a day off or were going to be late.

After hearing oral argument and taking the matter under advisement, the trial court granted Gipson Brothers' motion for summary disposition on the record, reasoning that *Janik* was "directly on point" and concluding that there was no issue of fact. The court then granted plaintiff's motion for voluntary dismissal. Plaintiff appeals as of right and argues that the trial court erred in granting Gipson Brothers' motion for summary disposition.

## II. STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *Spiek v Dep't of Trans*, 456 Mich 331, 337; 572 NW2d 201 (1998). Because the trial court considered documentary evidence beyond the pleadings, this Court construes the motion to have been granted pursuant to MCR 2.116(C)(10). *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012). "In reviewing a motion brought under MCR 2.116(C)(10), we review the evidence submitted by the parties in a light most favorable to the nonmoving party to determine whether there is a genuine issue regarding any material fact." *Id*. at 270-271 (citations omitted). "A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds could differ." *Bennett v Detroit Police Chief*, 274 Mich App 307, 317; 732 NW2d 164 (2006).

## III. ANALYSIS

In his second amended complaint, plaintiff alleged that Gipson Brothers was liable under both a direct theory of liability and was vicariously liable for the acts of Kevin, its employee. Thus, we proceed by examining whether there were genuine issues of fact to support either theory, viewing the evidence submitted by the parties in the light most favorable to plaintiff. *Cuddington*, 298 Mich App at 270-271.

## A. VICARIOUS LIABILITY

"To establish a prima facie case of negligence, a plaintiff must prove the following elements: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Loweke v Ann Arbor Ceiling & Partition Co*, 489 Mich 157, 162; 809 NW2d 553 (2001). Additionally, "[A] master is responsible for the wrongful acts of his servant committed while performing some duty within the scope of his employment." *Rogers v JB Hunt Transp, Inc*, 466 Mich 645, 651; 649 NW2d 23 (2002) (quotation marks and citations omitted). Thus, "[u]nder the doctrine of respondeat superior, the negligence of an employee, arising out of

acts done within the scope of his employment is imputed to his employer." *Hekman Biscuit Co v Comm Credit Co.*, 291 Mich 156, 160; 289 NW 113 (1939).

The trial court held that there were no questions of fact to support that Gipson Brothers was liable for the acts of Kevin based on the borrowed servant doctrine set forth in *Janik*, 180 Mich at 562. In *Janik*, our Supreme Court set forth the following "control test" "to use in determining whether a person, to whom an employer has loaned its employee, has become liable as an employer for the employee's acts, without any actual employment contract or payment for service." *May v Harper Hosp*, 185 Mich App 548, 553; 462 NW2d 754 (1990). The *Janik* Court articulated the doctrine as follows:

> A person who avails himself of the use, temporarily, of the services of a servant regularly employed by another person may be liable as master for the acts of such servant during the temporary service. The test is whether in the particular service which he is engaged or requested to perform he continues liable to the direction and control of his original master or becomes subject to that of the person to whom he is lent or hired, or who requests his services. It is not so much the actual exercise of control which is regarded, as the right to exercise such control. *To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under control of a third person.* Subject to these rules the original master is not liable for injuries resulting from acts of the servant while under the control of a third person. [*Janik*, 180 Mich at 562 (emphasis added).]

Thus, under the *Janik* "control test," "the initial question in determining whether summary judgment may be granted . . . is whether there is any evidence from which a trier of fact could conclude that [the employer] had not resigned full control over its employee . . . ." *Noble v Roadway Exp, Inc*, 153 Mich App 12, 19; 394 NW2d 128 (1986). Where a rational trier of fact could conclude that the employer retained at least partial control over its employee, summary disposition is not warranted and there remains a genuine issue of fact for trial. *Id*.

In this case, the trial court erred in granting summary disposition because, the evidence, viewed in a light most favorable to plaintiff, left open a question of fact regarding whether Gipson Brothers retained, at minimum, partial control over Kevin.

Deposition testimony supported that Williams was in control of the tasks that the operators performed and the work site in general, but other testimony supported that Gipson Brothers also retained some control over the operators. Sherman Gipson, vice president of Gipson Brothers, testified that the company did not provide supervisors at the PROC and neither he nor his fellow corporate officers provided directions to the operators when they were at the worksite. Sherman explained that Williams directed the operators regarding what to do with the leased equipment. However, when Sherman was asked if Kevin was an employee of Williams during the demolition project, Sherman replied, "No, he was my employee," and he considered Kevin to be his employee during the time Kevin was at the PROC. In addition, Sherman agreed that Gipson Brothers paid Kevin's workers compensation insurance and wages during the time Kevin was at the jobsite. Furthermore, Gipson Brothers subbed in new operators if one of the operators was absent and the operators called Gipson Brothers if they needed to take a day off

work. Gipson Brothers also retained the right to terminate and discipline the operators while they were at the worksite, but Williams could also request that an operator be removed.

Dwayne Gipson testified that he worked at the PROC for two months. He would ask Williams directly for work to perform, but he agreed that he remained an employee of Gipson Brothers while he was at the jobsite. Martez Gipson testified that he worked at the PROC site and operated heavy equipment. Martez testified that he was employed by Williams when he was at the jobsite and he reported to Williams for assignments. However, Martez testified that Herman Gipson, Jr., would at times tell him to get back on his machine and get back to work. He agreed that when Williams was not at the jobsite, Herman, Jr., would "look after us," but was not "the boss." Herman, Jr., only said to do things if Williams wanted something done in a specific way.

Kevin testified that while he was at the PROC jobsite he worked for Williams, but he also testified that he considered himself an employee of Gipson Brothers while he was at the site. Kevin explained that Williams directed all of the work at the PROC jobsite. Herman, Jr., was not in charge but he would help facilitate the work. Kevin agreed that Gipson Brothers employees would follow Herman, Jr.'s, directives. Kevin testified that he asked Williams when he wanted a day off work. However, Kevin agreed that Gipson Brothers paid his salary, issued his W-2, and gave him a raise while he was at the jobsite. Williams never paid him and Williams did not have anything to do with the amount he was paid.

Herman Jr. testified that he operated heavy equipment at the PROC jobsite and that Williams told everyone what to do. Herman, Jr., explained that Gipson Brothers' operators had Williams sign daily work tickets, but Gipson Brothers paid the operators the same wages they received at other jobsites and the company maintained workers compensation insurance for the employees. This contrasted with Williams' employees who were paid in cash at the jobsite. Herman Jr. testified that he did have supervisory authority over other Gipson Brothers employees at the jobsite, but he could not terminate Gipson Brothers' employees. Gipson Brothers employees would tell him if they were going to be late. He would instruct certain employees regarding when to move scrap, but he did not have authority to direct Kevin on how and where to use the SkyTrack; instead, Williams told Kevin what he wanted done with the SkyTrack. Herman Jr. testified that he had authority to choose which Gipson Brothers employee helped him with certain aspects of the demolition and if he saw someone doing something unsafe, he would tell them about it.

Williams testified that Herman, Jr., was the "safety man" at the jobsite. Williams testified that Herman, Jr., was the "superintendent" or the "man with the highest authority on the job site," but Williams also testified that he was Herman, Jr.'s, supervisor and he had the highest authority. Williams testified that Herman, Jr., instructed Kevin to lift plaintiff, but Herman, Jr., denied Williams' testimony.

In sum, the record shows that Gipson Brothers paid the operators while they were at the worksite, the operators testified that they were employees of Gipson Brothers and Sherman, the vice president, testified that Kevin was his employee while he was deployed at the PROC. In addition, Herman, Jr., retained some authority over some of the other Gipson Brothers' employees and employees would inform him if they were going to be late to work. Additionally,

-7-

Williams' and Herman, Jr.'s, testimony conflicted to some extent regarding the extent of Herman, Jr.'s, control and conflicts in testimony are matters for a jury to resolve. Sherman testified that the operators would call in to Gipson Brothers when they needed a day off work and Gipson Brothers retained the right to discipline or terminate the operators. Furthermore, Gipson Brothers continued to pay the operators' salaries and workers' compensation insurance. Finally, the operators, including Kevin, all used Gipson Brothers' equipment while they were at the PROC jobsite and that equipment was exclusively used by Gipson Brothers' employees. As our Supreme Court stated in *Janik*,

> One of the important considerations involved in this class of cases is the ownership of the equipment, appliance, or instrumentality with or in relation to which the temporary service, out of which the alleged injury arose, is performed. If it be the property of the general master who has loaned or hired the servant, there is a stronger reason, followed by a greater presumption, that he should and would retain in whole or in part the control and right to dictate and direct its use in carrying out the work. While not always controlling, this has often been recognized as sufficient to turn the scale in otherwise doubtful cases, particularly in that line of special service relating to transportation, or carrying of persons and property. [*Janik*, 180 Mich at 563.]

On this record, we conclude that there were questions of fact regarding whether Gipson Brothers retained some amount of control over its employees at the PROC. Therefore, the trial court erred in granting summary disposition with respect to plaintiff's vicarious liability claim.

### B. DIRECT LIABILITY

Plaintiff alleged that Gipson Brothers was directly liable in the following ways:

> Failing to provide a properly trained, certified and supervised operator for the lift truck.

> Failing to properly train Kevin Gipson . . . in the manner required by MIOSHA Part 13. . . .

> Failing to ensure that Kevin Gipson was competent to operate a powered industrial truck safely, as demonstrated by his successful completion of the training and evaluation specified by MIOSHA. . . .

> [Failing to adequately train, evaluate, and certify Kevin per MIOSHA standards.]

At essence, these claims involve allegations of negligent supervision or training of Kevin.[2] Michigan courts have recognized that negligent supervision, training, and hiring of

---

[2] Plaintiff argues in his brief on appeal that he asserted a "negligent entrustment" claim in his complaint as well as a claim of negligent performance of a work contract. However, the second

-8-

employees can be cognizable as a claim of direct liability that is separate and distinct from a claim based on vicarious liability. See, e.g. *Cox ex rel Cox v Bd of Hosp Managers for City of Flint*, 467 Mich 1, 11; 651 NW2d 356 (2002) (noting that, in addition to vicarious liability, "[a] hospital may be . . . directly liable . . . through claims of negligence in supervision of staff physicians as well as selection and retention of medical staff . . ."); *Zsigo v Hurley Med Ctr*, 475 Mich 215, 227; 716 NW2d 220 (2006) (noting that while general rules is that employers are not liable for acts of employees committed outside the scope of employment, "employers will continue to be subject to [direct] liability for their negligence in hiring, training, and supervising their employees").

The trial court did not articulate reasons for granting summary disposition as to plaintiff's claims of direct liability. Instead, the court cited *Janik*, 180 Mich at 557, and granted summary disposition as to all of plaintiff's claims. The court erred in doing so. The borrowed servant doctrine in *Janik* may absolve an employer of vicarious liability, but it does not apply to claims involving direct liability. See *Nichol v Billott*, 406 Mich 284, 296; 279 NW2d 761 (1979) (noting that "[t]he 'servant' concept at common law performed one main function: to delimit the scope of a master's *vicarious tort liability*" (emphasis added) (quotation marks and citations omitted)). Here, the trial court erred in holding that the borrowed servant doctrine precluded plaintiff's claims of direct liability where that doctrine is inapplicable to those claims.

Moreover, there were genuine issues of fact regarding whether Gipson Brothers failed to adequately train, certify and supervise Kevin in his operation of the lift truck. Plaintiff alleged that, because of this failure, Kevin was "untrained, uncertified and unqualified to operate the lift truck, and unskilled and careless in the manner in which he operated it," and that Kevin "improperly operated the lift truck in such a manner that [plaintiff's] right hand was crushed against a roof beam. . . ." Plaintiff produced evidence to support his theory. Specifically, plaintiff's safety expert Brayton testified that he reviewed the depositions of the operators at the worksite. He opined that there were "innumerable" MIOSHA violations. Brayton testified that the basket used to lift plaintiff did not meet MIOSHA standards for a work platform and testified that MIOSHA requires a lift operator to be able to see the platform at all times. Kevin's testimony suggested that he did not have a clear view where he was lifting the basket; he could not see the steel trusses that the boom hit and he did not see part of the boom. Additionally, Brayton testified that MIOSHA required that Gipson Brothers issue a permit to operate the SkyTrak. Testimony showed that Gipson Brothers did not issue any permit to Kevin. On this record, a rational trier of fact could determine that Gipson Brothers failed to properly train or supervise Kevin.

## IV. CONCLUSION

The trial court erred in granting summary disposition in this case where there were issues of fact regarding whether Gipson Brothers retained some amount of control over Kevin and where there were issues of fact regarding whether Gipson Brothers was directly liable.

---

amended complaint contains no reference to "negligent entrustment," and, plaintiff fails to cite any evidence showing that he had a contract with Gipson Brothers, which Gipson Brothers negligently performed. Therefore, these arguments fail.

Reversed and remanded for further proceedings consistent with this opinion. Plaintiff having prevailed may tax costs. MCR 7.219. We do not retain jurisdiction.


/s/ Stephen L. Borrello
/s/ Kurtis T. Wilder
/s/ Cynthia Diane Stephens