**William KRENTZ, Administrator of the Estate of Roy P. Stewart, Jr., Plaintiff-Appellant,**

v.

**UNION CARBIDE CORPORATION and Worthington Corporation, Defendants-Appellees.**

**No. 16477.**

United States Court of Appeals
Sixth Circuit.

Aug. 1, 1966.

---

10. See note 5, above.

William D. Eggenberger, Detroit, Mich. (Eggenberger & Eggenberger, Detroit, Mich., Raubolt, MacDonald & Dodge, Don F. Dodge, Trenton, Mich., on the brief), for appellant.

Buell Doelle, Detroit,· Mich. (Vandeveer, Haggerty, Doelle, Garzia, Tonkin & Kerr, Detroit, Mich., on the brief; Ashley Cole, Legal Dept., Union Carbide Corp., New York City, of counsel), for appellee Union Carbide Corp.

G. Cameron Buchanan, Detroit, Mich., for Worthington Corp.

Before WEICK, Chief Judge, O'SULLIVAN, Circuit Judge, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

This appeal arises out of an action brought in the United States District Court for the Eastern District of Michigan, Southern Division, by William Krentz, Administrator of the Estate of Roy P. Stewart, Jr., against Union Carbide Corporation and Worthington Corporation. Jurisdiction of the Court was invoked by virtue of diversity of citizenship (Section 1332(a), Title 28, U.S.C.).

The plaintiff is a resident of the State of Michigan and is the duly appointed

and qualified administrator of the Estate of Roy P. Stewart, Jr., deceased. Union Carbide Corporation is a New York corporation and Worthington Corporation is incorporated in Delaware. Both corporations are authorized to do business in the State of Michigan and at the time the cause of action herein accrued, they were doing business in the Southern Division of the Eastern District of Michigan. We will refer to these corporations as Union Carbide and Worthington. The case was tried to a jury and at the conclusion of the plaintiff's evidence the district judge directed a verdict in favor of the defendants, Union Carbide and Worthington. The plaintiff appealed.

Roy P. Stewart, Jr., the plaintiff's decedent whom we will call the deceased, met his death on June 21, 1961, as a result of a fire or an explosion in Union Carbide's oxygen manufacturing plant at Ecorse, Michigan. This plant went into operation in May of 1960. Prior thereto the combustion department of Great Lakes Steel Corporation posted bids on its bulletin boards throughout the plant notifying its employees of nine available jobs in the new oxygen plant, known as the Linde Plant, a division of Union Carbide. The deceased submitted a bid and was given an examination by Great Lakes Steel to determine whether he was qualified for one of the jobs. The examination was prepared and given by Great Lakes Steel with the assistance and cooperation of the superintendent of the Linde Plant. Union Carbide, through this plant, supplied oxygen to Great Lakes Steel for its manufacture of steel.

The deceased was found to be qualified for one of the nine available jobs and subsequently went to work in the new oxygen plant of Union Carbide. He waived seniority rights at Great Lakes Steel in favor of the better job at Union Carbide. He had worked in this plant about a year before his accidental death. He continued to be a member of United Steel Workers of America, the union representing Great Lakes Steel employees. He was paid his wages by Great Lakes Steel and he punched a Great Lakes Steel time card in a Great Lakes Steel time clock. His time card had to be counter-signed by a Great Lakes Steel foreman in order to receive his pay. He was entitled to all of the fringe benefits provided for in the Union contract with Great Lakes Steel. Any grievances were processed through the Union with Great Lakes Steel. Great Lakes Steel paid workmen's compensation benefits as a result of his death. The deceased was schooled in the new operation at the Linde Plant by Union Carbide employees. He took orders regarding work and shifts from Union Carbide. He was working in the plant and on the property of Union Carbide. His work of producing oxygen was the work of Union Carbide. The control and supervision of the operation was by Union Carbide employees. Great Lakes determined only the amount of oxygen it required.

The plaintiff brought the action against Union Carbide on the ground of common law negligence. Union Carbide claimed that the deceased was a loaned employee from Great Lakes Steel and as such became an employee of Union Carbide and subject to workmen's compensation benefits under that employment.

The Workmen's Compensation Law of Michigan has the following pertinent sections:

Section 17.145 M.S.A., C.L. 1948, § 411.5 defines private employer as,

"2. Every person, firm and private corporation, including any public service corporation, who has any person in service under any contract of hire, express or implied, oral or written."

Section 17.147 M.S.A., C.L.S. 1961, § 411.7 defines private employee as,

"2. Every person in the service of another, under any contract of hire, express or implied, * * *"

Section 17.144 M.S.A., C.L. 1948, § 411.4 provides,

"Where the conditions of liability under this act exist, the right to the recovery of compensation benefits, as

herein provided, shall be the exclusive remedy against the employer."

■■ It is a well established doctrine of Workmen's Compensation Law that an employee of a general employer may be loaned to a special employer who then becomes liable for workmen's compensation. Such an employee is referred to as a lent employee. The essentials for a lent employee relation are set forth in 1 Larson's Workmen's Compensation Law, Section 48.00 at p. 710,

> "When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if
>
> (a) The employee has made a contract of hire, express or implied, with the special employer;
>
> (b) The work being done is essentially that of the special employer; and
>
> (c) The special employer has the right to control the details of the work."

■ In passing on Union Carbide's motion for a directed verdict the trial judge said,

> "Since this is an action between employer and employee, and compensation law is involved, the first question that must be determined is whether the deceased made a contract of hire with the alleged special employer, as there can be no compensation liability in the absence of a contract for hire between the employee and the borrowing employer. The employee's consent to the new employment relation may however be implied from the employee's acceptance of the special employer's control and direction.
>
> "In the present case, there is undisputed evidence, in the opinion of this Court, that there was such consent on the part of the employee. He volunteered for the work, took the necessary tests, waived certain seniority rights, reported for work at the plant for about a year up to the time

of the accident and acquiesced to the work assigned to him by Union Carbide's employees. There was, therefore, an implied contract for hire, and the Court must then pass to the second and third questions, namely, whether he was at the time of the accident doing work essentially that of the special employer and whether the special employer assumed the right to control the details of the work.

> "In the opinion of the Court, on the undisputed evidence in the case, both questions must be answered in the affirmative. The compressor upon which he worked and the plant in which it was located were property of Union Carbide. The work of producing the oxygen was that of Union Carbide, even though it was for the use of Great Lakes Steel. All the control and supervision of the operation was by Union Carbide employees, with the exception of determining how much oxide was required by the Great Lakes Steel and the payment of wages. On the basis of these indicia, the Court cannot escape the conclusion, based upon the authority of Denton vs. Yazoo [& M. V. R. Co.], 284 U.S. 305 [52 S. Ct. 141, 76 L.Ed. 310], that the deceased was at the time of the accident a lent employee of the Union Carbide and was therefore subject to the State compensation laws and not liable under negligence laws."

We agree.

■ Jurisdiction being based on diversity of citizenship, the substantive law of Michigan is controlling, Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. It is argued on behalf of the plaintiff that the Supreme Court of Michigan in determining who is an employer has abandoned control as a test and has substituted therefor the test of economic reality which must be determined from all of the facts of the case. It is claimed that under this theory there was a factual question to be submitted to the jury.

The cases[1] cited by counsel for the plaintiff do not persuade us that the Supreme Court of Michigan has changed the law with reference to the doctrine of lent employee. In *Schulte* the Court held that an employee of a general contractor could sue the owner for common law negligence. The owner whose contract price included the cost of workmen's compensation insurance could not claim the benefits of workmen's compensation as an exclusive remedy. He was in no sense an employer.

In Tata v. Muskovitz, the question was whether Muskovitz was liable to Tata's widow for workmen's compensation. Muskovitz was a plumbing contractor who employed Tata to dig trenches for his work in laying pipe. The Court held that Muskovitz was the employer.

*Goodchild* is another case in which the question involves the payment of workmen's compensation by an employer. While the Court stated that it had abandoned the control test, it said at p. 193 of 134 N.W.2d:

"Even if the so-called control test were determinative, this passage quoted by Erickson in his brief would require our affirmance of the award he seeks altered. Erickson's own testimony, which indicates that he retained substantial control over his employee Goodchild while the latter was helping unload the van fails to meet the Arnett [Arnett v. Hayes Wheel Co., 201 Mich. 67, 166 N.W. 957] test since Erickson did not 'resign full control of the servant for the time being.' "

The *Powell* case, which called forth the learned discussion on control as applied to remedial social legislation of the Honorable Talbot Smith, then a Justice of the Supreme Court of Michigan and now a Judge of the United States District Court for the Eastern District of Michigan, involved the question of whether one Rebecca Cohen was an employee or an independent contractor. Rebecca Cohen did retouching of negatives for the H. A. Powell Studios. She did this work in her home and when she was relieved of her employment after a busy season she sought compensation under the Michigan Employment Security Act. (Section 17.501 et seq. M.S.A., C.L.1948, § 421.1 et seq.) The Supreme Court held that she was an independent contractor and not an employee. This led to the dissent of Mr. Justice Smith which the Court ultimately adopted in abandoning control as the exclusive test for the determination of an employer-employee relationship for the purposes of remedial social legislation.

It is to be noted that in the *Tata* and *Goodchild* cases the actions were to establish employee-employer relationships for the purpose of allowing participation in the benefits of the Workmen's Compensation Law. In the *Powell* case the right to participate in the benefits of the Employment Security Act was involved. These legislative acts are what we understand Mr. Justice Smith and the Supreme Court of Michigan to refer to as "remedial social legislation". In the case at bar it is conceded that the widow of the deceased was entitled to the benefits of the Workmen's Compensation Law from Union Carbide. Counsel for plaintiff do not seek to establish an employee relationship with Union Carbide but rather to establish that there was no such relationship. They apply the process of reasoning that was used in the cited cases to attempt to establish the contrary. The negative purpose here is to clear the way for a common law negligence action against Union Carbide. Such an action seems to us to be unrelated to remedial social legislation.

We do not find that the Supreme Court of Michigan has overruled the principle announced in the cases on the doctrine of lent employee. In Janik v. Ford Motor Co., 180 Mich. 557, 561, 147 N.W. 510, 512, 52 L.R.A., N.S., 294 the Court said,

---

1. Schulte v. American Box Board Co., 358 Mich. 21, 99 N.W.2d 367; Tata v. Muskovitz, 354 Mich. 695, 94 N.W.2d 71; Powell v. Employment Security Commis-sion, 345 Mich. 455, 75 N.W.2d 874; Goodchild v. Erickson, 375 Mich. 289, 134 N.W.2d 191.

"The rule is long settled that a servant in the general employment of one person may also become the special servant of another, with all the mutual rights and obligations of master and servant between them for the time of, and in relation to, the special service in which the servant is temporarily engaged. If an employer loans a servant to another for some special service, the latter with respect to that service may become liable as a master for the acts of the servant without any actual contract of employment between them or payment for service."

In Arnett v. Hayes Wheel Co., 201 Mich. 67, 69, 166 N.W. 957, 959, the Court quoting from 26 Cyc. p. 1522, stated the rule as follows:

"A person who avails himself of the use, temporarily, of the services of a servant regularly employed by another person may be liable as master for the acts of such servant during the temporary service. The test is whether in the particular service which he is engaged or requested to perform he continues liable to the direction and control of his original master, or becomes subject to that of the person to whom he is lent or hired, or who requests his services. It is not so much the actual exercise of control which is regarded as the right to exercise such control. To escape liability the original master must resign full control of the servant for the time being; it not being sufficient that the servant is partially under the control of a third person. Subject to these rules, the original master is not liable for injuries resulting from acts of the servant while under the control of a third person; but, on the other hand, the original master is liable, and the third person is not liable, where the control of the servant is retained by the original master."

In this case the general employer continued to pay the wages of the lent employee.

See also Rockwell v. Grand Trunk Western Railway Co., 253 Mich. 144, 234 N.W. 159; Lewis v. Summers, 295 Mich. 20, 294 N.W. 82; Tuttle v. Embury-Martin Lumber Co., 192 Mich. 385, 158 N.W. 875; Buskirk v. Ide, 302 Mich. 154, 4 N.W.2d 504. The doctrine of lent employee has been followed in the Sixth Circuit, Fries v. United States, 6 Cir., 170 F.2d 726, 731. The leading case in the United States Supreme Court is Denton v. Yazoo & M. V. R. Co., 284 U.S. 305, 52 S.Ct. 141. Other Supreme Court cases are Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; Linstead v. Chesapeake & Ohio Ry. Co., 276 U.S. 28, 48 S.Ct. 241, 72 L.Ed. 453. The general principles relating to liability of general and special employers in the case of a lent employee is stated in 35 Am. Jur., Master and Servant, Section 18, pp. 455–456.

The facts as to the relationship of the deceased with Great Lakes Steel and Union Carbide are undisputed. Under those facts the trial judge was justified in granting a directed verdict for Union Carbide on the ground of the lent employee doctrine. There is ample authority both in the State of Michigan and in the Federal Courts to sustain the application of this doctrine to the facts of this case.

Other assignments of error on this appeal relate to the directed verdict in favor of Worthington. Worthington manufactured and sold the oxygen booster compressor, which is the subject of this action, to Union Carbide in May, 1960. The compressor was manufactured on specifications prepared by Union Carbide and installed under supervision of Worthington in the Linde Plant of Union Carbide at Ecorse, Michigan. At the time of the installation, Worthington supplied Union Carbide with a manual of instructions. This manual was used in instructing the personnel who used and maintained the compressor. No other instructions or warnings relative to the use and maintenance of the compressor were given by Worthington.

The compressor had three cylinders, each of which had two suction valves and two discharge valves. The valves con-

sisted of a valve guard, a valve seat and six stainless steel strips or feathers. It is not unusual for these feathers to break occasionally. When this happens it is necessary to remove the broken pieces from the cylinders and valve parts. The accident was apparently caused by operating the compressor with broken pieces of feathers in the cylinders.

About one month after the compressor was installed, Union Carbide experienced an excessive breakage of feathers in both suction and discharge valves. This led to an inspection by both Worthington and Union Carbide and ultimately resulted in reboring the vertical cylinder and installing oversize piston rings. This corrected the problem of excessive breakage of feathers and the compressor functioned properly thereafter. The accident happened about one year later.

The plaintiff, in his complaint, charged Worthington with negligence in several respects, relating to construction, use of materials, design, replacement of parts and failure to warn the decedent and persons working with the compressor of its inherent dangers. The plaintiff further charged Worthington with breach of express and implied warranty that the compressor and the valves of the cylinders connected therewith were suitable and reasonably fit for the use intended.

Among the assignments of error in the trial of the action against Worthington are claims that the Court erred in holding that expert witness John A. Hinckley was not qualified to testify regarding the design of the oxygen booster compressor and in ruling as a matter of law that Worthington was not negligent in the design of the compressor.

■■ The question which led to the trial judge's ultimate ruling and which is the subject of these assignments of error is, "Can you tell us, Doctor, whether or not this compressor could feasibly be designed to eliminate broken feathers from getting into the cylinder?" The trial judge gave very careful consideration to the qualifications of the witness and heard extensive arguments from counsel on the admissibility of testimony of the witness concerning the design of the compressor. We conclude that the trial judge ruled correctly on the qualifications of the witness and that he did not abuse his discretion in refusing to let the witness testify on the subject of design. The qualification of an expert witness is largely discretionary with the trial judge. Empire Oil & Refining Co. v. Hoyt, 112 F.2d 356, C.A. 6; Grand Trunk Western R. Co. v. H. W. Nelson Co., 116 F.2d 823, C.A. 6, rehearing den. 118 F.2d 252; Lee Shops, Inc. v. Schatten-Cypress Company, 350 F.2d 12, C.A. 6, cert.den. 382 U.S. 980, 86 S.Ct. 552, 15 L.Ed.2d 470; Bonner v. Polacari, 350 F.2d 493, C.A. 10; Trowbridge v. Abrasive Co. of Philadelphia, 190 F.2d 825, C.A. 3; Berolzheimer v. Heil Company, 340 F.2d 122, C.A. 7; McEwen v. Bigelow, 40 Mich. 215.

■ We recently had occasion to pass on the question of negligence in design as a matter of law. Gossett v. Chrysler Corporation, 359 F.2d 84, C.A. 6. We stated the rule at p. 87 as follows:

"It is the duty of a manufacturer to use reasonable care under the circumstances to so design his product as to make it not accident or foolproof, but safe for the use for which it is intended. ' This duty includes a duty to design the product so that it will fairly meet any emergency of use which can reasonably be anticipated. The manufacturer is not an insurer that his product is, from a design viewpoint, incapable of producing injury. 76 A. L.R.2d Section 1(b)." [p. 94]

See also Evans v. General Motors Corporation, 359 F.2d 822, C.A. 7; Davlin v. Henry Ford & Son, 20 F.2d 317, C.A. 6 (Mich.). What we said in Gossett v. Chrysler with reference to defects and negligence in manufacture is applicable here.

"There was no defect in the latch as produced and there was no negligence in its manufacture. It was manufactured strictly in accordance with the design. It functioned perfectly for the purpose for which it was intended. It was only when it was misused

that it did not function properly." 359 F.2d p. 88.

We find no error in the ruling of the trial judge that as a matter of law there was no actionable negligence on the part of Worthington in the design of the oxygen booster compressor.

Another assignment of error is that the trial judge erred in ruling as a matter of law that Worthington was not negligent in failing to give adequate instructions and warnings regarding the dangers involved in operating the compressor after broken feathers had been replaced.

We find no merit to this assignment of error. Dr. Hinckley testified that the most probable cause of the accident was a piece of a broken feather in a cylinder. The compressor was started, after a feather had broken, without removing all of the pieces. The record shows that Martin Corcoran, Superintendent of the Union Carbide Plant at Ecorse, and other personnel of Union Carbide had full knowledge of the operation of the compressor and knew of the danger of operating it with a piece of broken feather in a cylinder. Employees of Union Carbide were warned through the manual furnished by Worthington that, "The running of a unit with a broken valve strip in a valve is dangerous practice and should be avoided."

At about nine or ten o'clock on the night of June 20th, Mr. Corcoran received word by telephone that the compressor was not functioning properly. He ordered it shut down and immediately went to the plant. It was determined that the trouble was caused by broken feathers. This trouble was corrected and the compressor was placed back in operation about midnight. On the following day, the day of the accident, further difficulty was experienced. Mr. Corcoran and other employees were there. Again the trouble was caused by broken feathers. Apparently all of the broken pieces were not recovered before the compressor was put back in operation. If there was any negligence which caused the accident it was on the part of the employees of Union Carbide in operating the compressor without recovering all of the pieces of broken feathers. Further warning of what Union Carbide employees already knew would have been futile.

Finally it is claimed on behalf of the plaintiff that the Court erred in ruling as a matter of law that there was no evidence of a breach of an implied warranty by Worthington.

We find no evidence to support plaintiff's claim of a breach of implied warranty. There is no claim and no evidence that any defective material or parts were used in the manufacture of the compressor and no evidence that it was not manufactured in accordance with plans, specifications and design. The real basis of the complaint is that the compressor was not designed so that broken feathers would not get into the cylinders. We have passed on this question of design, ante.

It was established that the accident was most probably caused by operating the compressor with a piece of broken feather from a valve being left in the cylinder. Worthington did not warrant that the feathers would not break. In fact it was recognized in the manual of operation furnished by Worthington that strips or feathers in valves would break.

"Caution: Whenever a valve with a broken strip is removed from a cylinder for repairs, all pieces of the broken strip must be found and removed from the cylinder bore and cylinder valve part, as such pieces may ultimately get in other valves and cause further breakage.

\* \* \* \* \* \*

"\* \* \* The running of a unit with a broken valve strip in a valve is dangerous practice and should be avoided." Manual of Operation.

We accept plaintiff's theory that privity of contract is not required in Michigan to maintain an action for breach of implied warranty. Finding no evidence of breach of implied warranty we do not reach that question.

The judgment of the District Court is affirmed.