PER CURIAM.
This case combined claims of medical malpractice against several defendants with a products liability claim against Coro-metrics Medical Systems, Inc. The trial court granted Corometrics a summary judgment and made it final pursuant to Rule 54(b), A.R.Civ.P. Plaintiffs appeal. We affirm and adopt the opinion of the circuit court, set out below:
“At approximately 1:30 a.m. on Monday, July 27, 1981, Sandra McGee was admitted to Jackson County Hospital with an admitting diagnosis of term pregnancy. Her blood pressure on admission was determined to be high at 148/100. The hospital records also indicate that Sandra McGee was connected to the fetal heart rate monitor manufactured by Corometrics and that the monitor was interpreted by Linda Sanders, the attendant nurse, as showing 'mild, variable decelerations, a good resting tone between contractions.’ According to Linda Sanders’ notes, Sandra McGee was then having contractions every two to three minutes with a duration of from forty to fifty seconds. The fetal heart rate monitor was showing a fluctuation in the fetal heart rate of from 120 to 130 beats per minute.
“Sandra McGee had herself noticed that she had had a bloody discharge before she went to the hospital. The nurse’s notes made some reference to this by the term ‘bloody show.’
“At 2:45 a.m., Linda Sanders noted that Sandra McGee’s blood pressure then was 134/96; that she continued to have contractions of moderate intensity every two to three minutes, with the contractions having a duration of fifty to sixty seconds. She noted that the reading on the fetal heart rate monitor was unchanged and that the dilatation of from one to one and one-half centimeters was also unchanged.
“At 3:40 a.m., Linda Sanders noted that the fetal heart rate monitor had been reconnected after having been disconnected twenty minutes earlier to permit Sandra McGee to go to the bathroom. She was then placed on her left side due to complaint of low back pain. Her blood pressure then was read as 138/94. Her pulse was read at 90.
“At 4:00 a.m., a vaginal examination was made by Patsy Lacks, the nurse who was supervisor over Linda Sanders. Patsy Lacks testified that she had already checked with Sandra McGee early after admission as part of her routine procedure whereby she checks on all new admissions during the night. Patsy Lacks disagreed with Linda Sanders’ interpretation of the paper tracing made by the fetal heart rate monitor. According to Patsy Lacks, the paper tracing made by the fetal heart rate monitor suggested possible beat-to-beat variability, minimal or decreased. It was her view that the reading of the fetal heart rate monitor was a possible indication of fetal distress as early as 1:25 a.m.
“The nurse’s notes indicate that Sandra McGee was then diagnosed as having poor resting tone following contractions with a blood pressure of 150/100 and that [Dr. Charles Raymond Bradford, III, another defendant in this case] was notified of her progress. Bradford himself testified that he was told that Sandra McGee had had no improvement of her blood pressure after having been given Vistaril. Bradford arrived at the hospital at approximately 4:30 a.m. He found that Sandra McGee’s blood pressure had continued to remain elevated in spite of treatment with Vistaril; that she had edema and no proteinuria (no protein in her urine). It was his opinion that Sandra McGee was preeclamptic. Bradford prescribed magnesium sulfate in order to prevent Sandra McGee from having seizures.
“In his admitting note, Bradford stated: “ ‘Mrs. Sandra McGee is a 21 y.o. gravida 1, para 1, 0-0-1, white female admitted to the hospital in spontaneous labor, approximately 1:30, seen by me at approximately 4:30 when she progressed to 1 cm. At that time she had increased blood pressure diastolic to 95-100 and had so for several hours. Fetal heart monitor showed poor beat varibility [sic]. The patient was followed for 2 more hours, continued to make no progress *888 despite good contractions and moderate sedation. The beat varibility [sic] did not improve, the patient therefore went on to have primary Caesarean section for fetal distress, failure to progress and toxemia of pregnancy.’
“Bradford testified on deposition that he meant that Sandra McGee had been admitted in spontaneous latent phase of labor. Bradford also disagreed with the discharge summary dictated by his partner, Dr. Coleman, which said that fetal distress was noted on the monitor with decreased beat-to-beat variability. Stating that Dr. Coleman was not present while Sandra McGee was in labor, Bradford testified that no fetal distress was noted on the monitor....
“At some time after 9:00 a.m., Sandra McGee was scheduled for Caesarean section. Bradford testified that he decided to take the baby by Caesarean section based on her preeclampsia and relative cephalo-pelvic disproportion. Bradford did not recommend Caesarean section because of any suspicion on his part that the fetus was in distress_
“Sandra McGee was taken to surgery at 9:40 a.m., but the surgery was not begun until 10:29 a.m. Following the delivery of the baby, Bentley Alan McGee, it was found that he was in distress. The apgar rating for Bentley Alan was two after one minute and four after five minutes. This was a very low rating. Apgar rating is a measurement of a new baby’s condition based on heart rate, respiratory effort, muscle tone, reflex irritability response to catheter in nostril and color. At some time after the delivery, Bentley Alan had a cardiopulmonary arrest and several attempts were made to give medicines to the baby and to obtain blood from the baby.... On Bradford’s recommendation, Bentley Alan was transferred to the Huntsville Hospital. Admitting diagnosis by Dr. Quirante at Huntsville Hospital was post-term birth, living child, C-section delivery secondary to fetal distress, perinatal asphyxia severe, hypoglycemia, disseminated.
“In their complaint, Sandra McGee, Mark McGee and Bentley Alan McGee allege that Bentley Alan was bom in severe respiratory distress; that he suffered permanent and extensive brain damage and permanent impairment to his nervous system.
“As a basis for their claim against Coro-metrics, the McGees allege that Corome-trics was negligent in its failure to adequately warn and instruct users in the proper use of its fetal heart rate monitoring machine. The machine is designed to be used to monitor the condition of the fetus while the mother is in labor prior to delivery. By giving instantaneous readings of the fetal heart rate as related to uterine contractions, the fetal heart rate monitor has become an important and useful means for diagnosing fetal distress. By studying the paper strips made by the machine showing any variation in the fetal heart rate in relation to uterine contractions, the medical expert who has had training, education and experience in the use of the machine is able in most instances to diagnose acute fetal distress during labor. However, special training in the operation of the machine and diagnosis of the paper tracings is important.
“Corometrics has submitted the Naacog Technical Bulletin, July, 1980, entitled ‘The Nurses’ Role in Electronic Fetal Monitoring,’ which discusses the need for a comprehensive educational program to provide obstetric nurses with special training and instruction in attaching and operating the fetal heart monitoring equipment, in pattern and interpretation, and in making a nursing diagnosis based on the data received from the monitor tracing. The bulletin also recommends as the second phase of the orientation program that the nurse work directly with the fetal heart monitoring equipment under the supervision of an experienced nurse. The two booklets recommended by the bulletin are An Introduction to Fetal Heart Rate Monitoring, by Edward H. Hon, M.D., F.A.C.O.G.; and Fetal Intensive Care Current Concepts: Monitoring Records with Self Instructions, by Richard H. Paul, M.D., F.A.C. O.G., and Roy H. Petrie, M.D., F.A.C.O.G. The bulletin also recommends continuing *889 education for the experienced nurse with regularly scheduled classes for updating and reviewing pattern interpretation, use and care of the fetal monitoring equipment, and skills used in EFM.
“According to the testimony of Marilyn Lapidus, Corometrics has been providing Dr. Hon’s booklet to purchasers of its equipment since 1970 and the manual prepared by Drs. Paul and Petrie to purchasers of its equipment since 1982.
“The Naacog Technical Bulletin submitted by Corometrics dated June, 1975, entitled ‘Petal Heart Rate Monitoring,’ recommends two FHR scales for display of data for pattern recognition, one with a paper chart speed of 3 centimeters per minute and an alternative scale with a paper chart speed of 4.5 centimeters per minute. The bulletin also states:
“ ‘An additional suggested feature is a strip chart paper speed of 1 cm/min for the purpose of screening. Although accurate pattern recognition is difficult if not impossible at this slow paper speed, FHR screening may be achieved more economically. When FHR abnormalities arise, the faster paper speeds will enhance FHR pattern recognition.’
“The recommendations regarding the FHR scales and paper chart speeds of 3 and 4.5 centimeters per minute were incorporated in the material provided with Dr. Hon’s booklet at pages 74 to 75.
“Counsel for the McGees argues in opposition to Corometrics’ motion for summary judgment and as a basis for its liability that Corometrics was negligent in failing to include in its operating manual and on the machine itself a warning or recommendation that the machine be operated at the 3 centimeter per minute paper chart speed, rather than the lower speed of 1 centimeter per minute. Counsel for the McGees has noted that Marilyn Lapidus, Corometrics’ director of medical education, acknowledged that she herself had difficulty in reading a tracing which was run at 1 centimeter per minute, despite her training and experience. Looking at the tracing involving Bentley Alan McGee, Marilyn La-pidus testified that she saw evidence of decreased base line variability which may be an indication of hypoxia, medication or cardiac arrhythmias. She considered the decreased variability as a warning sign of fetal distress sometimes indicating compression of the umbilical cord. Lapidus did acknowledge that the tape at a speed of 1 centimeter per minute was more difficult to interpret.
“ ‘Paper speed is running at a 1 centimeter speed instead of a 3 centimeter speed which makes the tracing look different than the standard.’ (Depo. of Lapidus, p. 92.)
[[Image here]]
“ ‘If you are using a reference that is 3 centimeters, then it looks different, so it’s difficult to interpret.’ (Depo. of Lapi-dus, p. 94.)

U i

“ ‘Q. Would you, yourself, be confused in reading a tracing that was run at 1 centimeter as opposed to 3 centimeters?
“‘A. Yes.
“ ‘Q. Does it present difficulties for you as the director of medical education, to read?
“‘A. Yes.
“ ‘Q. It’s much easier to read and diagnose from the 3 centimeters?
“‘A. Yes.
M i
“ ‘Q. Is it your statement that it is impossible to interpret a tape that is made at that speed? (1 cm/min)
“‘A. No.
“ ‘Q. You just say it is more difficult?
“‘A. Yes.
“‘Q. A person that knows what they are doing can still interpret the same thing that you have interpreted on it?
“ ‘A. If they are aware of the fact that it’s at a different speed, yes.'
“The fetal heart monitoring machine then should have been operated at a paper tracing speed of 3 centimeters per minute rather than 1 centimeter per minute.
*890 “The issue here presented on Corome-trics’ motion for summary judgment is whether Corometrics was under any duty or obligation to provide further recommendation or warning regarding the use of the appropriate paper tracing speed of 3 centimeters per minute.
“It is clear from a study of the two manuals prepared respectively by Dr. Hon and Drs. Paul and Petrie that the making of diagnoses from the fetal heart rate patterns is far from an exact science. In his book at page 52, Dr. Hon states:
“ ‘The treatment of fetal distress is based on an understanding of the patho-physiologic mechanisms underlying the two FHR patterns which indicate fetal distress. Every attempt should be made to eliminate these ominous FHR patterns since there are much data to support the observation that in the presence of an innocuous FHR pattern, the fetus is almost always (about 98 per cent) delivered in good condition.’
“ ‘In the event that the offending FHR patterns cannot be eliminated entirely, a decision has to be made as to what constitutes acceptable alleviation. These criteria are more difficult to define, since they are dependent on controlled studies over extended periods of time so that infant growth and development can be evaluated. To date, this study has not been done adequately. Until it is, interim criteria must be used. Those set forth in this discussion are based on our experience and represent the best estimation that we are able to make at the present time. It is possible that they will need modification in the light of further studies, but even now, inexact as they may be, they appear to be of clinical benefit.’
“Dr. Hon then notes that the two most frequent FHR patterns associated with a clinical diagnosis of fetal distress are those of cord compression (variable deceleration) and uteroplacental insufficiency (late deceleration). The latter according to Dr. Hon is most often caused by the overenthusiastic use of oxytocin. Dr. Hon further states:
“ ‘While the use of corrective measures in the treatment of fetal distress will be efficacious in the large majority of patients, there will be a number of patients where it would be difficult to make a clinical decision.
“ ‘In our clinical practice, we have taken the position that if ominous FHR patterns persist for thirty minutes after the institution of the outlined therapeutic measures, labor is terminated operatively. There is nothing absolute about this time interval. Its selection is based on our experience with FHR patterns, fetal biochemistry studies, neonatal condition, and limited infant follow-up studies. Its validity is currently being tested in our clinical monitoring program. Presently, it appears to be reasonable since there has been a marked decrease in the incidence of Caesarean section for clinically diagnosed fetal distress and a lower incidence of depressed babies, especially in the high-risk group.
“ ‘When there is a marked alleviation of the FHR patterns in fetal distress, the decision to continue labor is relatively easy to make. When there is only partial alleviation, the decision is much more difficult and will be subject to individual interpretation and the special circumstances of a particular labor.’
“The fetal heart monitoring machine is not a piece of equipment to be used by laymen or by even persons skilled in medical treatment without their first having been given special training and instruction in its use. The nurses’ bulletins indicate the need for special training and instruction for nurses initially in learning to use the machine and also for continuing educational programs for the experienced nurses. The bulletin talks in terms of regularly scheduled classes using a variety of teaching methods. Marilyn Lapidus testified that it was part of her job as director of medical education at Corometrics to participate as part of the faculty in seminars and symposiums and to work with program directors of seminars to establish a pro *891 gram format, location of meetings and to select the faculty for teaching seminars involving the use of the Corometrics heart monitoring machine. At one such level I Workshop conducted in Huntsville, Alabama, under the North Alabama Perinatal Outreach Program, on January 4,1979, it is shown that a nurse named Sandra Strawn Jennings, employed by Jackson County Hospital, was present. Lapidus testified that it was taught at the seminars that the recommended speed was 3 centimeters per minute.
“At page 1-2 of Fetal Intensive Care by Paul and Petrie, the manual found to have been stored with the Corometrics fetal heart monitor at Jackson County Hospital, the authors compared two tracings of identical data, one recorded at 3 centimeters per minute and the other at 1 centimeter per minute. The following statement is made:
“ ‘The FHR-UC data are the same as that shown on the preceding page. It was originally recorded on tape and subsequently reproduced. Notice that the FHR-UC display at the far right of the panel appears different yet similar to that shown on the left. The FHR-UC data are identical, but that displayed on the left was recorded at 3 cm/min. whereas that shown to the right was recorded at 1 cm/min. The left and right tracings contain exactly the same temporal information. For proper evaluation of FHR-UC data, the paper speed must be considered. Normally, clinical fetal monitoring is done at 3 cm/min. and at this speed each dark vertical line represents the passage of one minute. The reader should note that direct measurement of these examples is not possible, since the tracings have been photographically reduced to one-third of their original size.’
“At page III — 20 of Fetal Intensive Care, a comparison is made between a paper speed of 1 centimeter per minute and that of 3 centimeters per minute. The book states the following:
“ ‘In the upper panel, the paper speed is 1 cm/min. Initially, an external system is being used for fetal monitoring and late decelerations are seen which leads to stopping the oxytocin. The cervix is fingertip (FT) dialated, and fifty percent effaced with the vertex at minus three station. The membranes are ruptured and when the internal system is used, the lack of FHR variability is clear and late deceleration persists.
[[Image here]]
“ ‘The paper is now changed to 3 cm/min. The increased paper speed enhances the diagnosis of late deceleration (compare the upper and middle panels). This fetus is believed to be compromised and preparation for Caesarean section is undertaken. The presence of late deceleration continues in the operating room.’
“The two books or manuals, that by Dr. Hon and that by Drs. Paul and Petrie, also provide instructions or warnings on other matters involved in the use of the fetal heart monitoring machine. For example, there is an extended discussion of the appropriate techniques for connecting the machine so as to obtain the best possible signals with as little interference as possible. There is also discussion of monitoring by attaching electrodes to the fetal buttocks or attaching a clip electrode transcervically to the fetal presenting part. Here, the manual by Dr. Hon points out that since penetration of the epidermis overlying the fetal presenting part could result in infection, this must be considered a disadvantage. At page forty-five of his manual, Dr. Hon summarizes the clinical significance of base line FHR changes as follows:
“ ‘1. Tachycardia is frequently associated with immaturity, maternal fever and minimal fetal hypoxia.
“ ‘2. Progressive tachycardia may be an early sign of fetal distress.
“ ‘3. Tachycardia, when associated with late or prolonged variable deceleration, indicates fetal distress, especially if variability is minimal or absent.
“ ‘4. Persistent bradycardia, where variability is present, unless associated with *892 marked FHR deceleration, has not been associated with depressed newborns. It may be associated with congenital heart lesions.
“ ‘5. Minimal or absent base line FHR variability indicates an alteration in the state of the nervous mechanisms controlling FHR, viz. fetal immaturity, “sleep” (fetal), drugs, acidosis, and asphyxia, congenital anomalies.'
“In the instruction manual prepared by Corometrics, effects and causes of improper operation are discussed at pages 15 and 24. At page 18, the manual discusses the importance of properly placing the photo-transducer on the mother in order to obtain good results.
“These examples of the instructions found in the manual illustrate the manufacturer’s difficulty in singling out any particular instruction or recommendation for particular emphasis. The manufacturer obviously could not put all of the possible warnings or recommendations on the face of the machine itself. Both of the manuals provided by Corometrics with the machine clearly indicate that the recommended paper tape speed was 3 centimeters per minute. It is inconceivable that anyone participating in a training program either at level I or at level II would not have been made aware of the fact that the machine should normally be operated at 3 centimeters per minute.
“The McGees have also presented the affidavit of Robert Cunitz, as a specialist in the areas of product usage testing, engineering psychology, human factors, perception, accident data systems and safety. It is his opinion that it is essential to the proper and safe use of the fetal heart monitor in performing its designed function that a warning label be placed on the monitor itself to advise the user as to the recommended speed and to inform the user why the monitor should not be run at the 1 centimeter per minute speed.
“However, Cunitz has not been shown to be an expert on the use and operation of fetal heart monitoring machines or the interpretation of paper tracings made by such machines. Furthermore, the machine was not designed for use by laymen. The issue with respect to the necessity of instructions on the machine itself that it be operated at a paper tape speed of 3 centimeters per minute must be decided keeping in mind the degree of skill, training and experience required to operate the machine properly.
“In Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841 (5th Cir.1967), Marjorie Ann Pruitt sustained third degree chemical burns on her scalp and right ear as a result of the application to her hair of a bleach manufactured by Helene Curtis and a developer containing peroxide manufactured by a company called Cosmair. Both the bleach and the developer were purchased from a beauty salon by a friend of Pruitt who then applied them to her hair at her home. As a result of the injuries she received, Pruitt made claim against Helene Curtis under the doctrine of strict liability in tort and also on the theory that the manufacturer had failed to provide appropriate instructions or warnings concerning the use of its products.
“Reversing a verdict and judgment in favor of Pruitt, the court of appeals for the fifth circuit held that the evidence did not support a conclusion that the bleach was defective. The court of appeals concluded that it was a matter of common knowledge that cosmetics could never be made completely safe for all users and could cause injuries for many reasons other than a defect in the product; that there was no evidence that it was the nature of the mixture rather than the method of the applier which caused the burn.
“With respect to the claim that Helene Curtis had failed to provide proper instructions, the court of appeals noted that the bleach was intended to be used by a professional beautician and not by a layperson such as Pruitt’s friend. The court’s opinion recited [at 857-58]:
“ ‘Mrs. Hendren had seen the “FOR PROFESSIONAL USE ONLY — NOT FOR PUBLIC SALE” language on the *893 Helene bleach. Her understanding of this language was that if you did not know how to use these products you had better leave them alone.... She admitted that she had no professional training....
“ ‘... In order to acquire a license, a beautician must complete a course of one thousand hours, 475 of which are related to the process of bleaching hair. According to the professional witness, burning is the most common danger and one must therefore take precautions against leaving the solution on too long. A professional never depends on the customer’s complaints and constantly surveys the hair to detect burning. This burning can be detected by holding the hand over the head. Burning can also be seen when the solution starts to move away from the scalp or bubble. The professional also would have taken a strand test every five minutes to determine whether the hair and the solution were reacting favorably. On a virgin head, like Mrs. Pruitt’s, the solution should be removed and a new application used before the mixture is applied next to the scalp. In order to prevent the mixture from touching the ears, cotton could be packed around them. Finally, the theory book used by Mrs. Nickerson provided that a patch test should always be taken of a virgin head to determine whether the customer might be allergic to the product.’
“The court of appeals further commented that the manufacturer has the right to expect that his product will be used in the normal and customary fashion, and that any directions provided by the manufacturer had to be adequate only for the professional's use. The court of appeals further stated:
“ ‘Appellee has confused the doctrines of adequate directions and adequate warnings. Directions tell how to use the product efficiently while warnings tell the dangers involved. Dillard & Hart, Products Liability: Directions for Use and the Duty to Warn, 41 Va.L.Rev. 145, 147 (1955). Here, the directions on both products, including the technical terms referring to the peroxides, were adequate for the professional. It is only in relation to the. professional that the adequacy of directions must be judged since a manufacturer does not have to give directions for use to a consumer when he has not employed his advertising to induce this consumer to make a purchase.’ [385 F.2d at 860.]
“Also see, e.g., Harper v. Remington Arms Co., 156 N.Y.Misc. 53, 280 N.Y.S. 862 (N.Y.Sup.Ct.1935); Kaspirowitz v. Sobering Corp., 70 N.J.Super. 397, 175 A.2d 658 (1961); Fierro v. International Harvester Co., 127 Cal.App.3d 862, 179 Cal.Rptr. 923 (1982); Thibodaux v. McWain Cast Iron Pipe Co., 381 F.2d 491 (5th Cir.1967); Pavlides v. Galveston Yacht Basin, Inc., 727 F.2d 330, 338 (5th Cir.1984).
“In Krentz v. Union Carbide Corp., 365 F.2d 113 (6th Cir.1966), Krentz made claim as the administrator of the estate of Roy Stewart, deceased. Stewart was killed as a result of a fire or explosion in Union Carbide’s oxygen manufacturing plant. As administrator, Krentz made claim against Worthington Corporation, the manufacturer of the oxygen booster compressor used in the plant. The compressor had three cylinders, each of which had two suction valves and two discharge valves. The valves consisted of a valve guard, a valve seat, and six stainless steel strips or feathers. According to the evidence, it was not unusual for these feathers to break occasionally. When a feather broke, it was necessary to remove the broken pieces from the cylinders and valve parts. The accident causing the explosion and Stewart’s death was apparently caused by operating the compressor with broken pieces of feathers in the cylinders. Upholding the action of the district court in directing a verdict in favor of Worthington, the court of appeals for the sixth circuit rejected the argument that Worthington was negligent in failing to give adequate instructions and warnings regarding the dangers involved in operating the compressor after broken *894 feathers had been replaced. The manual contained the following:
“ ‘Caution: Whenever a valve with a broken strip is removed from a cylinder for repairs, all pieces of the broken strip must be found and removed from the cylinder bore and cylinder valve part, as such pieces may ultimately get in other valves and cause further breakage.
[[Image here]]
“ ‘... The running of a unit with a broken valve strip in a valve is dangerous practice and should be avoided.’
“The court of appeals concluded that the employees at Union Carbide were warned through the manual. The court also stated:
“ ‘If there was any negligence which caused the accident it was on the part of the employees of Union Carbide in operating the compressor without recovering all of the pieces of broken feathers. Further warning of what Union Carbide employees already knew would have been futile.’ [865 F.2d at 120.]
“In Scott v. Black & Decker, Inc., 717 F.2d 251 (5th Cir.1983), Scott, an employee of the National Valve Company engaged as a pipe fitter in the construction of a power plant in Louisiana, had been instructed to remove a temporary gas pipeline and was given a new Black & Decker portable band saw with which to cut the steel pipe so that it could be removed. His partner had turned off the gas supply and had opened the pipe to the atmosphere but had not flushed the pipe with air. When Scott had cut about one-third of the way through the pipe, he smelled gas. An explosion followed, causing Scott to fall approximately eight feet to the ground sustaining burns and back injuries. He made claim against Black & Decker on the theory that Black & Decker was negligent in failing to warn him that its electric portable band saw was dangerous if used in a flammable atmosphere.
“Affirming the decision of the trial court which directed a verdict in favor of Black & Decker, the court of appeals for the fifth circuit held that Black & Decker had fulfilled its duty to warn in that case by including an explicit warning about the use of the saw in explosive atmospheres in its owner’s manual provided with each Black & Decker saw. The court of appeals stated:
“ ‘The owner’s manual, which Black & Decker issues with each saw, lists twenty safety warnings on the first inside page, including instructions to ground the tool adequately, to wear proper apparel, to keep guards in place, to maintain properly, etc., in addition to an explicit warning about use of the saw in explosive atmospheres. The saw itself had a label instructing the user to read the owner’s manual before using the tool. The manufacturer knew that electric motors spark in normal operations, and that the sparks could ignite flammable gasses; the manufacturer also passed that knowledge on to the purchaser, through the manual, and to the user, through the instructions on the saw itself. More it cannot do; to require it to place a specific warning encompassing these facts on the saw is beyond the “reasonable steps” demanded by Chappuis [v. Sears, Roebuck & Co., 358 So.2d 926 (La.1978)]. In this case, the injury was caused by explosion, but it could just as easily have been caused by failure to observe any of the other nineteen safety precautions. To require that one explicit warning be placed on the saw would be to require all twenty. We hold that Black & Decker fulfilled its duty to warn; the saw was not defective under Louisiana law.’ [717 F.2d at 254.]
“In the present case now before this Court, Corometrics supplied with each of its fetal heart rate monitoring machines two books which give detailed and explicit instructions on the use and operation of the machine and the interpretation of the data provided by it. It is recited in one of the books that the recommended speed is 3.0 centimeters per minute. One of the two manuals makes a comparison of the identical data recorded by a fetal heart monitoring machine at 1 centimeter per minute and also at 3 centimeters per minute.
*895 “The fetal heart rate monitoring machine is a highly sophisticated and complex piece of equipment. It was designed to be used by skilled and experienced personnel as a diagnostic tool and to provide additional information to nurses and physicians regarding the condition of the fetus during labor. In order to learn how to use the machine, it is necessary for persons not only to read the manuals and understand the operation of the machine but also to undergo classroom instructions in its use and to participate under the supervision of an experienced operator in using the machine on patients. It was not reasonably foreseeable by Corometrics that persons would be allowed to use the machine who had not had courses of instruction or experience in the use of the machine. Before it could be determined that Corometrics had a legal obligation to place such a warning on the machine, it would be necessary to first conclude that Corometrics had reason to believe that the machine would be operated by laymen and inexperienced persons. Even then, it would be obviously impractical to place on the machine all of the instructions or warnings regarding its use which are found in the manual.
“[Defendant Corometrics has presented evidence showing that it was not negligent and in opposition to its motion for summary judgment] [n]o evidence has been presented from which it is possible to reach a determination that Corometrics was guilty of any negligence which proximately caused or contributed to cause any injuries or damages to the plaintiffs. [There appears to be no genuine issue of material fact and Corometrics was entitled to judgment as a matter of law. Rule 56, A.R. Civ.P.]
“In accordance with this opinion, the Motion for Summary Judgment filed by Coro-metrics is hereby granted. Judgment is hereby rendered in favor of the defendant Corometrics Medical Systems, Inc., a corporation.”
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES, SHORES and ADAMS, JJ., concur.